Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

## 2023 CO 12

**No. 21SC505, *People v. Madrid*—Jury Selection—Racial Discrimination—*Batson v. Kentucky*—Pretext—Remand Hearings.**

The supreme court holds that when a party has been provided with an adequate opportunity to present race-neutral justifications for a challenged peremptory strike under the second step of *Batson v. Kentucky*, 476 U.S. 79 (1986), that party is later barred from introducing new race-neutral justifications on remand. To reach this conclusion, the court relied on *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005), which explained that "a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." After determining that the prosecution offered new justifications for the strike on remand, beyond the reasons the prosecution originally stated at trial, the court affirmed the judgment of the court of appeals and remanded for a new trial.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

## 2023 CO 12

### Supreme Court Case No. 21SC505
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 17CA2058

### Petitioner:

The People of the State of Colorado,

v.

### Respondent:

Theodore Israel Madrid.

### Judgment Affirmed
*en banc*
March 27, 2023

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
Erin K. Grundy, Senior Assistant Attorney General
    *Denver, Colorado*

**Attorneys for Respondent:**
Megan A. Ring, Public Defender
Lynn Noesner, Deputy Public Defender
    *Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court, in which **JUSTICE MÁRQUEZ, JUSTICE GABRIEL, JUSTICE HART,** and **JUSTICE BERKENKOTTER** joined.
**CHIEF JUSTICE BOATRIGHT** dissented.
**JUSTICE SAMOUR** did not participate.

JUSTICE HOOD delivered the Opinion of the Court.

¶1 Decades ago, the Supreme Court created a three-step test for determining when a peremptory strike against a prospective juror has been exercised in a discriminatory manner. *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986). The second step requires the party responding to an accusation of a racially motivated strike to justify the strike with a race-neutral reason. *Id.* at 97–98. Sometimes, an appeal based on *Batson* prompts a reviewing court to return the case to the trial court for additional findings. This occurred in the case before us involving Theodore Israel Madrid.

¶2 Following a second appeal in this case, we agreed to consider whether a party on remand may raise a *new* race-neutral reason to justify a peremptory strike made at trial. Our answer is no. We hold that when a party has been provided with an adequate opportunity to present its race-neutral justifications at trial, it is barred from introducing new race-neutral justifications on remand. Our application of that holding to the facts here prompts us to affirm the judgment of the court of appeals, which means that Madrid is entitled to a new trial.

## I. Facts and Procedural History

### A. Trial

¶3 In 2011, Madrid was charged with one count of first degree murder and two counts of child abuse resulting in death.

3

¶4      In 2012, Madrid went to trial on these charges. During jury selection, the prosecution excused prospective juror J.T., a Black man who indicated on his juror questionnaire that he was sixty-eight years old, married with children, and a retired customer-service specialist.

¶5      The trial court called J.T. into the jury box late in the jury-selection process after excusing seven jurors. Upon replenishing the pool of prospective jurors seated in and around the jury box, the court gave each side a total of five minutes to question the seven new prospective jurors, including J.T.

¶6      The following exchange then occurred:

[Prosecution]:    So, [J.T.], any issues that you had with anything that either of us had said or anything that the Court has said as far as the instructions of law?

[J.T.]:           No, not yet.

[Prosecution]:    Not yet. Okay. Any concerns about having to look at — potentially have to look at autopsy pictures in the case?

[J.T.]:           No.

[Prosecution]:    No? Okay. Anything you want to tell us?

[J.T.]:           No.

[Prosecution]:    Do you have a good joke?

[J.T.]:           I'm the joke.

Later, the prosecution used its ninth peremptory challenge to excuse J.T.

¶7      In response, Madrid raised a *Batson* challenge. Specifically, Madrid argued:

4

[J.T.] was one of the last people on the jury. According to his questionnaire, he's fact neutral. He was asked a few questions by both parties and he gave very short answers and seemed to be unbiased. I don't see any other reason why he would be dismissed at this time.

¶8 The prosecution then provided the following justification for its use of a peremptory strike:

Judge, first of all, he's being replaced by another African-American juror. So, I don't think that they can really claim that this is not race neutral. But the real problem is we don't know very much about him. He has a hearing issue it appears and he's sort of completely nonresponsive. We have very little information on him from the questionnaire and no time to really have a very detailed conversation with him. Terribly uncomfortable with him where we have very little information.

The trial court confirmed the prosecution's race-neutral reasons, repeating that the prosecution was "excusing [J.T.] because of the little information that was provided in the questionnaire and the brief opportunity you had to question him." The court also questioned the prosecution's offered rationale that J.T. was hard of hearing, and the prosecution clarified that "[h]e appears to and I could have just been mumbling, but he appeared to [be hard of hearing] to me."

¶9 Before rendering its decision on the *Batson* challenge, the trial court volunteered its own assessment of J.T. The court offered that J.T. "didn't seem like he wanted to be here ... based on his demeanor" and that he "seemed disappointed that I called his name when he started walking to the front of the courtroom." The court also acknowledged that J.T. was soft-spoken, mumbled,

5

and at times was difficult to understand, though the court expressed doubt as to "whether that means he has a hearing problem or not." Finally, the court emphasized that J.T. was replaced by another Black juror, that the defendant was Hispanic (not Black), and that race was not an issue in the underlying case.

¶10 The court then found the defense failed to make a prima facie showing that the prosecution excluded J.T. because of his race and that the totality of the relevant facts didn't give rise to an inference of purposeful discrimination, per step one of *Batson*. Because the defense failed to meet its burden at *Batson*'s first step, the court denied the challenge.

¶11 The following day, the trial court offered both parties the opportunity to supplement the record from jury selection. The prosecution offered nothing more regarding why it had exercised a peremptory strike against J.T.

¶12 After a nine-day trial, the jury convicted Madrid on all counts.

## B. First Appeal and Remand Proceedings

¶13 Madrid appealed, and a division of the court of appeals determined that the trial court erred by finding that Madrid had failed to meet his step-one burden of establishing a prima facie case of discrimination. *People v. Madrid*, No. 13CA298, ¶ 20 (Jan. 12, 2017) ("*Madrid I*").

¶14 The division considered—and rejected—some of the trial court's stated reasons for determining that Madrid failed to establish a prima facie case of

6

discrimination. For example, it rejected the court's apparent reliance on its observations that a Black juror replaced J.T. and that Madrid was Hispanic rather than Black, explaining that prior caselaw rendered those facts irrelevant to a *Batson* analysis. *Madrid I*, ¶¶ 16–17; *see also People v. Collins*, 187 P.3d 1178, 1184 (Colo. App. 2008); *People v. Burke*, 937 P.2d 886, 888 (Colo. App. 1996). The division also concluded that the trial court improperly relied on the prosecution's arguments that it had minimal time to question J.T. and that J.T.'s questionnaire lacked detail, as other potential jurors with similar circumstances were seated without the lack of information being an issue. *Madrid I*, ¶ 18. Thus, the division determined that the trial court erred when it found that Madrid hadn't made a prima facie case of racial discrimination. *Id.* at ¶ 20.

¶15 The division implicitly accepted the trial court's assertion that it stopped its analysis before moving onto step two of *Batson*. *Id.* at ¶¶ 7, 22. So, the division remanded the case to the trial court. *Id.* at ¶¶ 21–22. "Because the trial court did not complete the three-step *Batson* analysis," the division directed the trial court to "take additional evidence and allow further argument at the request of either party." *Id.* at ¶ 22.

¶16 In 2017, the district court commenced remand proceedings to complete the fact finding necessary for *Batson*'s second and third steps, almost five years after the original trial.

¶17 At the outset, Madrid objected to the prosecution offering race-neutral justifications that hadn't been stated during the 2012 jury trial. The district court overruled the objection because the remand order explicitly instructed it to "take additional evidence and allow further argument at the request of either party" and because its previous ruling hadn't extended beyond the first step of the *Batson* analysis.

¶18 Because the trial court hadn't made express findings related to the prosecution's stated race-neutral justifications for its strike of J.T. (*Batson*'s second step), the prosecutor who conducted voir dire testified at the remand hearing to complete the record. She acknowledged that she initially didn't remember who J.T. was, but her recollection of him gradually improved as she reflected on jury selection in the case. She described J.T.'s demeanor after being called: "I believe there was a sigh. He was slow to take his seat. He did not appear to be delighted to know that he had now been asked to join the people in front of the bar." She also acknowledged that he "warm[ed] up slightly," but not enough to assuage her concerns that "he really didn't want to be here for some reason" and that she lacked information on why that might be.

¶19 The prosecutor explained her initial description of J.T. as "nonresponsive," clarifying that she believed that "unengaged is a better word." She also addressed

8

her comment at trial about J.T.'s hearing, contending that it related to his lack of engagement:

> [I]t goes to the whole, I don't want to be here, and I'm not engaging with you. It doesn't matter to me why the person is not engaging with me. If it's because they can't hear and they're willing to tell us that, then we might be able to make an accommodation. But if it's because they can't hear and they are unwilling to tell us that, again, they don't want to be here.

When asked directly whether his hearing was the issue, she affirmed, "No, absolutely not."

¶20 On cross-examination by defense counsel, the prosecutor acknowledged that she had spent less than a minute questioning J.T. and never questioned him about anything on his questionnaire. She also confirmed that she had failed to make a contemporaneous record that J.T. sighed and was slow to take his seat. She claimed that while she made no explicit record that J.T. seemed unhappy to be called forward, she had used the term "nonresponsive" to suggest as much.

¶21 At the end of the remand hearing, the district court determined that the prosecution met its step-two burden to provide facially race-neutral reasons for striking J.T. Then, in its step-three analysis, the court rejected Madrid's claims that the prosecutor's explanations were pretextual, concluding instead that Madrid failed to meet his burden to prove by a preponderance of the evidence that the prosecution engaged in purposeful discrimination.

## C. Second Appeal

¶22 Madrid appealed again, and a second division of the court of appeals reversed. *People v. Madrid*, 2021 COA 70, 494 P.3d 624 ("*Madrid II*").

¶23 The division concluded that "it is improper for a trial court to offer its own race-neutral reason for the prosecution's use of a peremptory strike." *Id.* at ¶ 35, 494 P.3d at 631; *see also Valdez v. People*, 966 P.2d 587, 592 n.11 (Colo. 1998). Accordingly, the division determined that the district court's observation that J.T. didn't want to be there—an observation that the prosecution itself never voiced at trial—was improper. *Madrid II*, ¶ 30, 494 P.3d at 630.

¶24 More broadly, the division held that "where the prosecution articulates its race-neutral reason for striking a potential juror during the *Batson* proceedings at trial, the district court cannot consider or base its ruling on new justifications offered on remand." *Id.* at ¶ 4, 494 P.3d at 626.

¶25 Next, the division conceded that the remand order required the district court to "take additional evidence and allow further argument at the request of either party." *Id.* at ¶ 42, 494 P.3d at 632. And it also acknowledged that it reviews a district court's final determination at *Batson*'s third step for clear error. *Id.* But it concluded that the remand court's reliance on the prosecution's new remand justification amounted to clear error. *Id.*

¶26    So, the division reversed Madrid's judgment and remanded for a new trial, finding it "impossible to . . . separate [the remand court's] reliance on the justifications the prosecution articulated at trial from [the remand court's] reliance on the impermissible post-remand justifications."  *Id.* at ¶ 43, 494 P.3d at 632–33.

¶27    The prosecution petitioned for review of the division's decision, and we granted certiorari.[1]

## II.  Analysis

¶28    We begin our analysis by discussing the three-step *Batson* framework and its constitutional underpinnings.  We then briefly consider the standard of review applicable here before turning to the core issue before us today: Whether new race-neutral justifications, separate from those offered at trial, are admissible on remand at *Batson*'s second step.  After concluding that such evidence is inadmissible, we consider whether the prosecution offered new arguments here, and, if so, what the appropriate remedy is when the trial court admitted such arguments in compliance with a remand order from the court of appeals.

---

[1] We granted certiorari to review the following issue:

> Whether a trial court, when conducting remand proceedings under *Batson v. Kentucky*, 476 U.S. 79 (1986), and *People v. Rodriguez*, 2015 CO 55, 351 P.3d 423, may consider additional evidence necessary to complete each step of the *Batson* analysis.

## A. *Batson* Framework

¶29    To understand *Batson*, it's helpful to know some of the statutory bases for excusing prospective jurors.  For example, under section 16-10-103, C.R.S. (2022), the legislature requires a trial court, upon a party's challenge, to remove prospective jurors who will not be impartial.  *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 16, 454 P.3d 1044, 1048.  Such challenges are dubbed "challenges for cause" and include situations where a prospective juror "evinc[es] enmity or bias toward the defendant or the state."  § 16-10-103(1)(j).

¶30    Under section 16-10-104, C.R.S. (2022), the legislature also provides for a certain number of "peremptory challenges" based on the nature of the case.  Unlike for-cause challenges, peremptory challenges allow "both the prosecution and the defense to secure a more fair and impartial jury by enabling them to remove jurors whom they perceive as biased."  *Vigil v. People*, 2019 CO 105, ¶ 19, 455 P.3d 332, 337 (quoting *People v. Lefebre*, 5 P.3d 295, 303 (Colo. 2000), *overruled on other grounds by People v. Novotny*, 2014 CO 18, ¶ 27, 320 P.3d 1194, 1203).  Such strikes typically can be used to remove prospective jurors without specifying a reason, though the use of peremptory strikes is necessarily constrained by the United States and Colorado Constitutions.  *Abu-Nantambu-El*, ¶ 19, 454 P.3d at 1049.

¶31     The Equal Protection Clause of the Fourteenth Amendment forbids racial discrimination in jury selection, which includes the use of peremptory strikes to excuse potential jurors based on race.  U.S. Const. amend. XIV, § 1; *Batson*, 476 U.S. at 89; *see also* Colo. Const. art. II, §§ 16, 25; *People v. Wilson*, 2015 CO 54M, ¶ 10, 351 P.3d 1126, 1131.  To secure this right, the Supreme Court created a three-step test for determining when a peremptory strike has been exercised in a discriminatory manner.  *Batson*, 476 U.S. at 96–98.

¶32     Step one requires the objecting party to make a prima facie showing that the challenged peremptory strike was based on the prospective juror's race.  *People v. Ojeda*, 2022 CO 7, ¶ 22, 503 P.3d 856, 862.  The standard the objecting party must meet in this first step is "not a high one," *Valdez*, 966 P.2d at 590, and is "easily satisfied," *Craig v. Carlson*, 161 P.3d 648, 655 (Colo. 2007).  On the contrary, "[a]s long as the totality of the circumstances raises an inference of racial motivation, the defendant has satisfied his step-one burden." *People v. Rodriguez*, 2015 CO 55, ¶ 10, 351 P.3d 423, 428–29.  The objecting party need not show a "pattern" of strikes; even a single strike can be sufficient to give rise to a prima facie showing under this step.  *Id.*, 351 P.3d at 428.

¶33 In step two, the burden of production shifts to the prosecution, which must offer a race-neutral explanation for the challenged peremptory strike.[2] *Batson*, 476 U.S. at 97–98. A race-neutral explanation is one "based on something other than the race of the juror." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). The explanation "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97. Rather, the prosecution must simply provide "any race-neutral justification for the strike, regardless of implausibility or persuasiveness." *Ojeda*, ¶ 24, 503 P.3d at 862. The step-two analysis "turns on the facial validity of the proponent's explanation." *Id.*

¶34 During step three, the defendant may rebut the prosecution's race-neutral explanations. The court then considers "the persuasiveness of the prosecutor's justification for his peremptory strike" in light of any such rebuttal. *Miller-El v. Cockrell*, 537 U.S. 322, 338–39 (2003) ("*Miller-El I*"); *see also Wilson*, ¶ 14, 351 P.3d at 1132. This includes consideration of "all of the circumstances that bear upon the issue of" purposeful discrimination, *People v. Beauvais*, 2017 CO 34, ¶ 23, 393 P.3d 509, 517 (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)), such as the striking

---

[2] Here, we refer to the responding party as the prosecution for simplicity's sake because the responding party was the prosecutor in this case. However, the same framework applies when a prosecutor is the objecting party during step one of *Batson*. *See Georgia v. McCollum*, 505 U.S. 42, 59 (1992).

party's demeanor, the reasonableness of the proffered race-neutral explanations, and whether the rationales are rooted in accepted trial strategy, *Miller-El I*, 537 U.S. at 339. The third step also requires the court to assess whether the prosecution's explanations are pretextual, which the court may infer if the prosecution's justifications shift over time or "reek[] of afterthought." *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005) ("*Miller-El II*"); *see also Foster v. Chatman*, 578 U.S. 488, 514 (2016).

¶35 Step three culminates with the court determining whether the objecting party has established purposeful discrimination. *Batson*, 476 U.S. at 98; *Valdez*, 966 P.2d at 590. The resolution of this question requires courts to apply a substantial-motivating-factor test; that is, if the court determines that a peremptory strike was "motivated in substantial part by discriminatory intent," the court may conclude that the strike was purposefully discriminatory under *Batson*. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) (quoting *Foster*, 578 U.S. at 513); *see also Ojeda*, ¶ 27, 503 P.3d at 863. Thus, because the burden of persuasion stays with the objecting party, the court should sustain a *Batson* challenge only if the objecting party proves by a preponderance of the evidence that the strike was

substantially motivated by discriminatory intent.[3]  *Ojeda*, ¶ 28, 503 P.3d at 863; *Beauvais*, ¶ 24, 393 P.3d at 517.

¶36     Finally, if an appellate court determines that the trial court's *Batson* findings are insufficient or incomplete, the proper remedy "is to remand the case to the trial court with directions to conduct the three-part *Batson* analysis and make the required factual findings."  *Rodriguez*, ¶ 2, 351 P.3d at 426.

## B.  Standard of Review

¶37     This court has long distinguished between questions of law, which we review de novo, and questions of fact, which trigger deference to the trial court's judgments.  *E.g.*, *People v. Allison*, 86 P.3d 421, 426 (Colo. 2004).  Hence, we review a trial court's factual determination as to the admissibility of evidence for an abuse of discretion, but the broader question of whether a type of evidence is ever admissible constitutes a legal question that we review de novo.  *See People v. Johnson*, 2021 CO 35, ¶¶ 15–16, 486 P.3d 1154, 1158.  Similarly, "[i]nterpretation of an appellate court mandate and the determination of whether the district court complied with it on remand are both questions of law subject to de novo review."

---

[3] As we emphasized in *Ojeda*, ¶¶ 50–52, 503 P.3d at 866, the court's ultimate finding at step three is distinct from a conclusion that the prosecution is racist or harbored a racial bias.  A successful *Batson* challenge "is not a determination that the prosecutor . . . harbored ill will or animosity" toward a prospective juror, a defendant, or a racial group more broadly.  *Id.* at ¶ 50, 503 P.3d at 866.

16

*Thompson v. Catlin Ins. Co. (UK)*, 2018 CO 95, ¶ 22, 431 P.3d 224, 229 (quoting

*Gannon v. State*, 368 P.3d 1024, 1039 (Kan. 2016)). So here, we review the propriety

and scope of the division's remand order de novo.[4] *See id.*

## C. Prohibition of New Race-Neutral Justifications on Remand

¶38 Courts have long recognized that shifting explanations for a peremptory

strike signal pretext, *e.g.*, *Foster*, 578 U.S. at 507, and pretextual explanations

"indicat[e] the very discrimination the explanations were meant to deny,"

*Miller-El II*, 545 U.S. at 265.

¶39 In *Miller-El II*, the Supreme Court considered a prosecutor's shifting

explanations for a challenged peremptory strike. *Id.* at 245–46. There, a prosecutor

mischaracterized a prospective Black juror's answer to a question about his

willingness to impose the death penalty. *Id.* at 244. When defense counsel pointed

out this misstatement, the prosecutor "neither defended what he said nor

---

[4] We recognize that "[o]n appeal, each step of the trial court's *Batson* analysis is subject to a separate standard of review." *Rodriguez*, ¶ 13, 351 P.3d at 429. The trial court's determinations at steps one and two receive de novo review, while the final determination of whether the objecting party has successfully met its step-three burden is reviewed for clear error. *Valdez*, 966 P.2d at 590–91. Because we focus on the remand order and the evidence admissible under it, we need not wade into these *Batson*-specific standards of review applicable to the trial court's decision-making.

withdrew the strike." *Id.* at 246. Instead, the prosecutor changed his explanation, offering a new race-neutral justification to support his strike. *Id.* The Supreme Court concluded that the prosecution's new explanation was improper, noting that it was "difficult to credit" and "reek[ed] of afterthought." *Id.* The Court also recognized that the state court's ready acceptance of this new explanation was improper, both because of its implausibility and "its pretextual timing." *Id.*

¶40 While *Miller-El II* doesn't directly address *Batson* remands, its broader skepticism of a prosecutor's changing race-neutral justifications remains instructive:

> [W]hen illegitimate grounds like race are in issue, *a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.* A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*Id.* at 252 (emphasis added).

¶41 Several other jurisdictions have also found this passage illuminating. For example, the Seventh Circuit, relying on this passage, determined that "*Miller-El II* instructs that when ruling on a *Batson* challenge, the trial court should consider only the reasons initially given to support the challenged strike, not additional reasons offered after the fact." *United States v. Taylor*, 636 F.3d 901, 905 (7th Cir. 2011). And the Third, Ninth, and Eleventh Circuits have all reached similar

18

conclusions. *See Holloway v. Horn*, 355 F.3d 707, 725 (3d Cir. 2004) ("[W]here a prosecutor makes his explanation for a strike a matter of record, our review is focused solely upon the reasons given."); *Love v. Cate*, 449 F. App'x 570, 572 (9th Cir. 2011) (rejecting a prosecutor's post-trial explanation because "the prosecutor never stated to the state trial court that he relied on these characteristics, even though *Batson* required him to articulate his reasons"); *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1269 (11th Cir. 2009) (rejecting state appellate court's acceptance of a prosecutor's later explanation for a strike because the "State never offered such a full explanation" at trial); *see also Chamberlin v. Fisher*, 885 F.3d 832, 856 (5th Cir. 2018) (en banc) (Costa, J., dissenting) ("[N]o other court applying *Miller-El II* has relied on reasons beyond those given at trial when comparing jurors . . . .").

¶42 Even so, the prosecution emphasizes that this court has authorized a trial court handling a *Batson* remand to conduct "further proceedings as it deems necessary," *see Rodriguez*, ¶ 20, 351 P.3d at 431, which endows remand courts with substantial discretion in ferreting out purposeful discrimination or the absence of it. While that may be true, such discretion is not unbounded. First, post hoc arguments for a peremptory challenge aren't "necessary" when the prosecution has already stated its reasons for the strike at trial. Second, in *Rodriguez*, the word "necessary" modifies "proceedings." *See id.* While a court has broad discretion to

conduct proceedings under this rule, *Rodriguez* doesn't allow a court to avoid its obligation to obey other relevant evidentiary or constitutional constraints. Thus, we find unpersuasive the assertion that *Rodriguez* should be read as essentially giving remand courts carte blanche to admit evidence without limitation.

¶43 The prosecution also analogizes *Batson* remands to suppression-hearing remands, arguing that *People v. Morehead*, 2019 CO 48, ¶ 13, 442 P.3d 413, 418, and *People v. Tallent*, 2021 CO 68, ¶ 18, 495 P.3d 944, 950, require deference to a remand court's determination of what evidence to hear. But these areas of the law are fundamentally different. First, *Batson* requires an analysis under its strict three-step framework, which inherently constrains a court's discretion in conducting a related hearing. Second, unlike suppression hearings, *Batson* remand hearings involve fact finding related to events that occurred on the record and in front of the court. Thus, *Morehead* and *Tallent* are inapposite.

¶44 With these points of law in mind, we return to the facts at hand.

### D. Application

¶45 At trial, the prosecution received an adequate opportunity to share its race-neutral reasons for striking J.T., despite the court's declaration that it stopped its *Batson* analysis at step one. After Madrid challenged the prosecution's strike of J.T., the prosecution immediately offered its race-neutral justifications for the strike, and the court even clarified and confirmed the prosecution's asserted race-

neutral justifications in addition to improperly adding its own justifications for the strike. Further, the following day, the court offered both parties the opportunity to supplement the previous day's record. Because the prosecution had an adequate opportunity to state its race-neutral reasons for striking J.T., we turn to whether the prosecution's justifications shifted between jury selection and the remand hearing.

¶46 At trial, the prosecution offered three justifications for striking J.T.: (1) the prosecution lacked information about J.T.; (2) J.T. was "sort of completely nonresponsive"; and (3) J.T. appeared to have a hearing issue. However, the trial court summarized the prosecution's stated race-neutral justifications as: (1) the lack of information about J.T. from his questionnaire; (2) the lack of information about J.T. due to the prosecution's brief opportunity for questioning; and (3) J.T. potentially being hard of hearing. The prosecution did nothing to correct the trial court's perception of its race-neutral justifications except to explain that "[J.T.] appears to and I could have just been mumbling, but he appeared to [have a hearing issue] to me."

¶47 On remand, a division of the court of appeals instructed the district court to "take additional evidence and allow further argument at the request of either party." Thus, the remand court did not limit the prosecution to its previously offered trial justifications. As the remand court explained:

I don't know if the court [of appeals] could be any clearer than that: "at the request of either party." The court didn't say only the Defense gets to present additional evidence or make argument or the People are limited to whatever evidence they presented before or whatever arguments they advanced before. It says, "The Court shall take additional evidence and allow further argument at the request of either party."

¶48 Perhaps recognizing the legal peril that it could invite if it sought to plow new ground, the prosecution offered race-neutral justifications that, it argued, "expand[ed] upon the record" and served as "a clarification of what we had previously said" at trial. The district court summarized the prosecution's race-neutral justifications on remand as falling into three overarching categories: (1) J.T. was "nonresponsive, nonparticipatory, and fail[ed] to engage and connect"; (2) there was "not enough information about [J.T.]"; and (3) "[J.T.] did not want to be here."

¶49 To be sure, there is some overlap between the prosecution's justifications at trial and on remand. Both times the prosecution justified its strike by stating that it lacked adequate information about J.T. And the evidence used to support this facially race-neutral justification—namely, that J.T.'s questionnaire was thin and the prosecution had little time to question him—remained consistent. However, the prosecution also offered a new race-neutral justification on remand.

¶50 The prosecution for the first time justified striking J.T. because it appeared as though he "simply did not want to be here." Indeed, at the remand hearing, the

22

prosecution reiterated this as a primary reason for the strike, mentioning some variation on that theme almost a dozen times. But at trial, the prosecutor asserted that "the real problem is we don't know very much about [J.T.]" The prosecutor mentioned J.T.'s hearing and unresponsiveness before reiterating that "[w]e have very little information on him . . . . Terribly uncomfortable with him where we have very little information." This constituted a shift in rationales for the peremptory strike that happened to track the trial court's independent observations about J.T.

¶51 The prosecution supported its new justification—that J.T. didn't want to be there—by suddenly explaining for the first time (five years after trial) that "[w]hen [J.T.'s] name was called, I believe there was a sigh. He was slow to take his seat. He did not appear to be delighted to know that he had now been asked to join the people in front" in the prospective jury panel. But again, the prosecution said nothing about this behavior at trial. So, as the court of appeals correctly acknowledged, "Such observations may have been accurate, but they were not the reasons the prosecutor stated for excusing [J.T.]" *Madrid II*, ¶ 39, 494 P.3d at 632.

¶52 Thus, we conclude that the prosecution offered a *new* justification for the strike on remand, separate from the justifications it offered at trial.

¶53 Furthermore, the prosecution's new remand arguments simply echoed the trial court's own impermissible observations about J.T.'s behavior. At trial, the court observed:

> I also note that my read of [J.T.], when I first called his name was that he didn't seem like he wanted to be here. . . . [I]t seemed to me that based on his demeanor, he doesn't want to be here, or at least when I called his name he didn't want to be here. He seemed disappointed that I called his name when he started walking to the front of the courtroom.

¶54 These observations directly track the prosecution's new remand justification that J.T. didn't want to be there and that he "did not appear to be delighted to know that he had now been asked to join the people in front of the bar." In our eyes, the prosecution's later adoption of the *trial court's* observations is particularly problematic, given that the court was likely to accept as valid its own justifications that it had previously, and erroneously, offered at trial.

¶55 We aren't persuaded otherwise by the prosecution's argument that on remand it merely elucidated the race-neutral justifications it had offered at trial. On remand, the prosecution explained that its initial justification that J.T. possibly suffered from a hearing issue "goes to the whole, I don't want to be here, and I'm not engaging with you." However, even the prosecution explicitly affirmed later that hearing was not the issue.

¶56 The prosecution similarly asserts that its trial statement that J.T. was "sort of completely nonresponsive" was really an attempt to articulate that J.T. appeared

as though he didn't want to be there. But the prosecution's only mention of J.T.'s nonresponsiveness at trial was in asserting that J.T. had a hearing issue—a justification that it discarded on remand. Notably, the prosecution didn't correct the trial court when it failed to include J.T.'s lack of engagement in its summary of the prosecution's race-neutral justifications. So, while J.T.'s nonresponsiveness may be a plausible explanation for the strike, we still conclude that the prosecution shifted its justification on remand, offering a new reason rather than merely explaining what it had said at trial.

¶57 The prosecution offered—and the remand court allowed—these new arguments because of the division's improper remand order, which broadly instructed the remand court to "take additional evidence and allow further argument at the request of either party" without limitation. By instructing the court to take additional evidence "at the request of either party," this order extended beyond the requirements of *Rodriguez*, which merely directs trial courts to "conduct further proceedings as it deems necessary on remand" to complete a *Batson* analysis. *Rodriguez*, ¶ 20, 351 P.3d at 431. Thus, we conclude that the

remand order was erroneous, and we must now determine whether the error warrants reversal and a new trial.[5]

## E. Remedy

¶58 "Ordinarily, when a trial court has not adequately conducted the *Batson* analysis, the appropriate procedure is to remand the case for more detailed findings by the trial court." *Rodriguez*, ¶ 19, 351 P.3d at 431 (quoting *Craig*, 161 P.3d at 654). Of course, that is what the *Madrid I* division did in this very case. And, we have noted, practical problems created by the passage of time are not necessarily a legal barrier to remand. *Id.* at ¶ 20, 351 P.3d at 431 ("The passage of time may create challenges for the trial court on remand, but those challenges do

---

[5] We recognize that differentiating between elaboration of an initial race-neutral justification and the development of a new justification on remand can be difficult. In other contexts, we give trial courts broad discretion to make difficult evidentiary determinations. *See, e.g.*, *People v. Melillo*, 25 P.3d 769, 773 (Colo. 2001) (relating to evidentiary determinations under CRE 401 and CRE 403). We do so here, too. As with other evidentiary rulings, appellate courts should review a remand court's determination of what arguments are barred as a new justification for an abuse of discretion. *See People v. Moore*, 2021 CO 26, ¶ 26, 485 P.3d 1088, 1095. An abuse of discretion occurs when the trial court's ruling is manifestly arbitrary, unreasonable, unfair, or based on an erroneous understanding of the law. *People v. Gutierrez*, 2018 CO 75, ¶ 11, 432 P.3d 579, 581. To the extent that the district court on remand made a finding that the prosecution's race-neutral justification for striking J.T. was not new, we conclude that its finding was manifestly unreasonable.

26

not alter the structure of the *Batson* analysis or relieve Rodriguez of his burden."). This much is settled law.

¶59 The remedy question before us now, however, is different. The problem is not a lack of findings; it's that error is baked into the remand court's otherwise thorough three-part *Batson* analysis. Plus, extraordinary factors contribute to the issues surrounding this case, including that twelve years have passed since the initial jury selection at issue and that the prosecution has already received two opportunities to offer its step-two justifications. Therefore, we must evaluate what remedy to use in the unusual circumstances with which we're now confronted.

¶60 There are two standards of reversal potentially applicable here: structural error and constitutional harmless error. A structural error is one that "require[s] automatic reversal without individualized analysis of how the error impairs the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 10, 288 P.3d 116, 119. Constitutional harmless error analysis involves an error of a constitutional dimension that is preserved by objection. *Id.* at ¶ 11, 288 P.3d at 119. These errors "require reversal unless the review court is 'able to declare a belief that [the error] was harmless beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Under the standard for constitutional harmless error, the prosecution bears the burden of proving that the error was harmless beyond a reasonable doubt. *Id.*

¶61 Today, we need not decide whether the erroneous *Batson* analysis that followed the improper remand order should prompt structural or constitutional harmless error review because reversal is warranted under either standard. Madrid preserved the issue through his objection to new arguments on remand, which implicates his constitutional right to a jury selected without the taint of racial discrimination. *See Batson*, 476 U.S. at 85. This triggers, at the very least, constitutional harmless error analysis. *See Johnson*, ¶ 17, 486 P.3d at 1158. Thus, we consider whether "there is a reasonable *possibility* that the [error] might have contributed to the conviction." *Hagos*, ¶ 11, 288 P.3d at 119 (alteration in original) (quoting *Chapman*, 386 U.S. at 24).

¶62 Like the *Madrid II* division, we find it impossible to retroactively disentangle how the error affected the subsequent remand proceedings. We have no way of determining how the prosecution's testimony would have unfolded if properly restricted to the justifications previously offered at trial. Further, the district court itself recognized that the prosecution's stated reasons for striking J.T. "are all really interrelated," which leaves us simply to speculate how the court might have ruled on Madrid's *Batson* challenge without factoring in the impermissible argument. On the unusual record before us, we find it impossible to determine whether a *Batson* violation occurred. Given the exceptional circumstances with which we're

28

confronted and considering the importance of the constitutional rights at stake, we conclude that we must reverse.

¶63 Because we cannot confidently declare that the error injected by the remand order into the proceedings was harmless beyond a reasonable doubt, Madrid is entitled to a new trial.

### III. Conclusion

¶64 We affirm the judgment of the court of appeals, reverse Madrid's judgment of conviction, and remand for a new trial.

**CHIEF JUSTICE BOATRIGHT** dissented.

CHIEF JUSTICE BOATRIGHT, dissenting.

¶65 The majority concludes that when a trial court conducts remand proceedings under *Batson v. Kentucky*, 476 U.S. 79 (1986), it cannot consider race-neutral explanations for a peremptory strike that weren't articulated at trial. Maj. op. ¶¶ 2, 28. The majority purports to base this conclusion on *Miller-El v. Dretke*, 545 U.S. 231 (2005). Maj. op. ¶¶ 38–41. But *Miller-El* didn't go nearly that far; it simply recognized the practical reality that, in many cases, these explanations may be less credible because they "reek[] of afterthought." *Miller-El*, 545 U.S. at 246. In so doing, it recognized that *Batson* trusts the trial court to consider each explanation (whether offered at trial or not), assess each for pretext, and make the right call, subject to clear error review. The majority departs from this framework by finding an evidentiary bar where none exists. In effect, it declares that *any* additional justifications, no matter what the circumstances, are irrelevant as a matter of law. It does so needlessly; parties are already well equipped to respond when a striking party offers new justifications for a strike. And the majority does so despite the pivotal role that trial courts play in assessing peremptory challenges for racial discrimination. As such, I respectfully dissent.

¶66 The exclusion of citizens from jury service on account of race is "a primary example of the evil the Fourteenth Amendment was designed to cure." *People v. Rodriguez*, 2015 CO 55, ¶ 9, 351 P.3d 423, 428 (quoting *Batson*, 476 U.S. at 85).

1

Accordingly, the Supreme Court designed the three-step *Batson* test "to ferret out the unconstitutional use of race in jury selection." *Miller-El*, 545 U.S. at 266 (Breyer, J., concurring). At *Batson*'s first step, the objecting party must make a prima facie showing that a peremptory strike was based on the juror's race. *Rodriguez*, ¶ 10, 351 P.3d at 428. At step two, the proponent of the strike must offer "a race-neutral explanation [for the strike] 'related to the particular case to be tried.'" *Id.* at ¶ 11, 351 P.3d at 429 (quoting *Batson*, 476 U.S. at 98). "[T]he bar at step two is not high." *Id.* An explanation doesn't need to be "persuasive, or even plausible"—it must only be race neutral. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). At step three, the trial court must determine whether the objecting party has established purposeful discrimination "in light of all the evidence." *Rodriguez*, ¶ 12, 351 P.3d at 429.

¶67 Each step of *Batson* is subject to a distinct standard of appellate review. *Id.* at ¶ 13, 351 P.3d at 429. Step one is subject to de novo review, though the reviewing court should defer to the trial court's underlying factual findings. *Id.* Likewise, step two is subject to de novo review. *Id.* But step three—the ultimate question of whether the opponent of the strike has established purposeful discrimination—is subject to clear error review. *Id.* The clear error standard reflects that *Batson* step three turns on determinations of credibility; because only the trial court can evaluate the parties' and prospective jurors' demeanor, appellate courts should ordinarily give "great deference" to the trial court's

2

step-three findings. *Id.* (quoting *Batson*, 476 U.S. at 98 n.21). In other words, step three findings are highly factual, requiring the trial court to use its discretion. Thus, the clear error standard applies on appeal.

¶68 In my view, the majority errs by stepping outside of the *Batson* framework. Instead, it opts to import the de novo standard of review from other contexts, including cases involving the Fourth Amendment exclusionary rule and the mandate rule. Maj. op. ¶ 37 & n.4 (first citing *People v. Johnson*, 2021 CO 35, ¶¶ 15–16, 486 P.3d 1154, 1158; and then citing *Thompson v. Catlin Ins. Co. (UK)*, 2018 CO 95, ¶ 22, 431 P.3d 224, 229). Nobody asked the court to do this, and for good reason: This case isn't about what the court of appeals *mandated*; it's about what the remand court *considered* when assessing *Batson*'s third step. Tellingly, the parties cite only the *Batson* standards of review in their briefs, and the division applied the appropriate *Batson* step-three standard (clear error) in its opinion. *See People v. Madrid*, 2021 COA 70, ¶¶ 10, 42, 494 P.3d 624, 627, 632. It's particularly difficult to square the majority's reliance on *Johnson*—a Fourth Amendment suppression case—with its later acknowledgment that *Batson* proceedings are "fundamentally different" than suppression proceedings because "*Batson* requires an analysis under its strict three-step framework." Maj. op. ¶ 43.

¶69 Respectfully, standards of review aren't fungible. It isn't prudent to transplant a standard from a different context, involving a different constitutional

3

right, and decide that it fits closely enough. Furthermore, it certainly isn't prudent to do so on our own initiative. *See Galvan v. People*, 2020 CO 82, ¶ 45, 476 P.3d 746, 757 ("[W]e adhere to the party presentation principle, which relies on the parties to frame the issues to be decided and assigns to courts the role of neutral arbiters of the matters raised."). The applicable standards of review here are the *Batson* standards, which account for the distinct issues involved in each step of the *Batson* analysis. *Rodriguez*, ¶ 13, 351 P.3d at 429. By putting these standards to one side, the majority not only risks sowing confusion in future *Batson* appeals—it also indirectly modifies the *Batson* case law we and the Supreme Court have built.

¶70     As the division below recognized, this is a *Batson* step-three case. *See Madrid*, ¶¶ 10, 42, 494 P.3d at 627, 632. Whatever one may think of the prosecutor's explanations for striking prospective juror J.T., each was race neutral; that is all *Batson*'s second step requires. *Purkett*, 514 U.S. at 768. The remand court therefore properly proceeded to step three of *Batson*. There, the remand court had to determine if the prosecutor's race-neutral reasons were credible. Madrid only appealed the court's step-three findings, framing the issue in his opening brief to the division as: "Whether the court erred in reaffirming its *Batson* ruling and denying Mr. Madrid a new trial on remand, despite evidence establishing pretext." The division then proceeded to review the remand court's step-three

4

findings for clear error.[1]  *Madrid*, ¶ 42, 494 P.3d at 632.  The division held that the remand court's "acceptance of and reliance on the new reasons to deny the *Batson* challenge amounts to clear error."  *Id.*  The People appealed this holding, arguing that the division impermissibly restricted the fact-finding function of remand courts in *Batson* proceedings.  And though the People argue that the remand court acted consistently with controlling law and the remand order, they didn't challenge the remand order itself.

¶71     Accordingly, I treat this issue for what it is: an assessment of the remand court's step-three *Batson* ruling, which we review for clear error.  *Rodriguez*, ¶ 13, 351 P.3d at 429.  Step three requires courts to decide "the ultimate question" of the *Batson* inquiry—whether the proponent of a strike engaged in purposeful discrimination.  *Id.* at ¶ 12, 351 P.3d at 429.  At the outset, it is important to recognize that ferreting out racial discrimination is easier said than done—it's a complicated, fact-bound process that requires the trial court to assess not only the plausibility of arguments, but also the credibility of the people advancing them.  *See People v. Wilson*, 2015 CO 54M, ¶ 14, 351 P.3d 1126, 1132; *Valdez v. People*,

---

[1] So too did several of the federal cases cited by the majority.  *See* Maj. op. ¶ 41; *United States v. Taylor*, 636 F.3d 901, 906 (7th Cir. 2011) ("Accepting new, unrelated reasons . . . amounts to clear error[.]"); *Love v. Cate*, 449 F. App'x 570, 572 (9th Cir. 2011) ("[W]e afford [the remand court] deference and review for clear error.").

966 P.2d 587, 599 (Colo. 1998) (Kourlis, J., dissenting) ("Discrimination is as sly as it is insidious. It lives in inference, tone, and gesture as much as in action.").

¶72 So, we've cautioned that "the trial court must evaluate all relevant facts" to guide it through *Batson*'s third step and, ultimately, determine whether racial discrimination is at play. *Wilson*, ¶ 14, 351 P.3d at 1132; *see also Rodriguez*, ¶ 12, 351 P.3d at 429 ("If the trial court is convinced, in light of all the evidence, that the proffered reason was pretextual and that the prosecutor actually based his peremptory strike on the prospective juror's race, then it must uphold the *Batson* challenge.").

¶73 At bottom, *Miller-El* (a *Batson* step-three case) stands for this exact proposition. The Supreme Court itself has told us as much: "In *Miller-El v. Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, *all* of the circumstances that bear upon the issue of racial animosity *must* be consulted." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (emphases added).

¶74 Indeed, it's clear that the *Miller-El* Court considered all of the circumstances involved in that case—including a prosecutor's shifting justifications for one strike—when determining that the prosecutor struck Black venire members on account of their race. In *Miller-El*, the prosecutor used peremptory challenges to dismiss 91% of the qualified Black venire members. 545 U.S. at 241. When

6

explaining these strikes, the prosecutor "simply mischaracterized" the testimony of a Black venire member, falsely claiming that the juror in question would only vote in favor of the death penalty if rehabilitation were impossible. *Id.* at 244. The defense pointed out this mischaracterization, and the prosecutor immediately offered a new explanation—that the juror's brother was previously convicted of a crime. *Id.* at 245–46.

¶75 Rather than ignoring the prosecution's new explanation or treating it as irrelevant as a matter of law, the Supreme Court addressed its plausibility head-on. *See id.* at 246. The Court noted, first, that the prosecutor's timing was suspicious. *Id.* But it then proceeded to address "other reasons rendering [the new explanation] implausible" on the merits. *Id.* Namely, the juror's "testimony indicated he was not close to his brother," and the prosecution didn't ask follow-up questions about the influence of his brother's conviction, "as it probably would have done if the family history had actually mattered." *Id.* So when the Court said that "[i]t would be difficult to credit the State's new explanation, which reeks of afterthought," *id.*, it was describing one reason among several that the explanation was suspect, not limiting the information that courts can consider when assessing a *Batson* challenge.

¶76 Separately, the Court discussed the strike of another Black venire member. *Id.* at 247. The prosecutor explained that it struck this juror because his responses

to questions about the death penalty "were inconsistent." *Id.* at 248. The Fifth Circuit, in upholding the strike, came up with a new explanation that the prosecutor never articulated: that the second juror was ambivalent about his ability to impose the death penalty. *Id.* at 250. The Court chastised the Fifth Circuit for "thinking up any rational basis" for the strike on the prosecutor's behalf; in so doing, the Court stated that "when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Id.* at 252.

¶77 Madrid argues that, by making this statement, the Court meant to say that prosecutors are held to the justifications that they originally offered at trial and pretext is inferred whenever the prosecution shifts from those justifications. But this reading of the "stand or fall" language in *Miller-El* overlooks the context in which it was made. The Court made this statement while warning appellate courts not to invent their own race-neutral justifications for a strike, as the Fifth Circuit had done when assessing the strike of the second juror; it had little to do with the prosecutor's post hoc explanation for striking the first juror. And this statement doesn't undercut the fact that the Court *did* evaluate the prosecutor's post hoc explanation for striking the first juror. *See id.* at 246. It would make no sense for the Court to consider the post hoc explanation for striking the first juror on the

8

merits if it intended to say, mere paragraphs later, that post hoc explanations for a strike are per se invalid.

¶78 Since *Miller-El*, the Court has recognized that shifting explanations "may be pretextual" while nonetheless continuing to consider those explanations on the merits. *See Foster v. Chatman*, 578 U.S. 488, 507–08 (2016). In *Foster*, for instance, a prosecutor initially justified a strike by arguing that the juror had a son who was the defendant's age; later, the prosecutor relied on the juror's membership in the Church of Christ, claiming that the Church's members were reluctant to vote for the death penalty. *Id.*

¶79 The Court noted, "[a]s an initial matter," that "the prosecution's principal reasons for the strike shifted over time, suggesting that those reasons may be pretextual." *Id.* at 507. But the Court proceeded to reject *both* explanations on the merits. *Id.* at 508–11. The prosecutor's initial explanation didn't hold up because the state accepted white jurors who had sons near the defendant's age. *Id.* at 508–09. And the prosecutor's new explanation fell flat because the juror repeatedly swore that he could impose the death penalty, the prosecutor erroneously claimed that other venire members were struck for their membership in the Church, and the prosecutor's notes indicated that the Church took no position on the death penalty and also stated: "NO *Black* Church." *Id.* at 510–11. So while the Court ultimately concluded that the second explanation was pretext,

the Court didn't stop its analysis once it had determined that the second explanation was "new." *See id.*; *see also Grant v. Royal*, 886 F.3d 874, 951 (10th Cir. 2018) (analyzing *Foster* and noting that the Court considered comparative juror evidence "[i]n addition to" other evidence of pretext, including the prosecutor's shifting explanations for striking Black jurors).

¶80 Thus, the Supreme Court has not barred trial courts from considering post hoc explanations for a strike. To the contrary, the Court has evaluated all explanations to determine whether they are pretextual, using the fact that a party switched explanations as one possible indicator of pretext. This treatment aligns with the Court's guidance that "all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S. at 478. All means all, including explanations that a party failed to immediately offer and including whether that timing is suspect.

¶81 In its opinion, the court of appeals went where the Supreme Court has never gone. The division contravened the Court's guidance by holding that the trial court "cannot consider or base its ruling on new justifications offered on remand." *Madrid*, ¶ 4, 494 P.3d at 626. On this appeal, Madrid characterizes the division's holding as merely recognizing "the specter of pretext" associated with shifting justifications. *See id.* at ¶ 42, 494 P.3d at 632 (quoting *United States v. Taylor*, 636 F.3d 901, 906 (7th Cir. 2011)). But the division did far more than that; it held

10

that "the reversible error in this case was the district court's *consideration of* and reliance on different justifications for the strike than the ones the prosecutor articulated at trial." *Id.* at ¶ 37, 494 P.3d at 631 (emphasis added).

¶82 Unlike the Supreme Court, the division stopped once it determined that the prosecutor here articulated additional explanations on remand. *See id.* at ¶ 30, 494 P.3d at 630. The division relied upon a case from the Seventh Circuit for this proposition. *Id.* at ¶ 37, 494 P.3d at 631 ("[*Miller-El*] instructs that when ruling on a *Batson* challenge, the trial court should consider only the reasons initially given to support the challenged strike, not additional reasons offered after the fact." (quoting *Taylor*, 636 F.3d at 905)). But *Miller-El* never said as much, and Seventh Circuit precedent isn't binding on Colorado courts. On the other hand, Supreme Court precedent *is* binding, and the Court has instructed us to consider *all* circumstances relevant to the issue of racial discrimination. *Snyder*, 552 U.S. at 478. The division erred by creating an evidentiary bar instead. In my view, the majority follows the court of appeals into uncharted territory and concludes that "new" race-neutral justifications are wholly inadmissible on remand. Maj. op. ¶ 28.

¶83 Beyond being contrary to Supreme Court precedent, this evidentiary bar is unnecessary. Parties are already well equipped to counter an opposing party's shifting justifications for a strike. When a striking party offers new justifications for a strike on remand, the challenging party's rebuttal strikes me as obvious and

11

compelling: Any new explanations are less credible because they "reek[] of afterthought," *Miller-El*, 545 U.S. at 246, and likely indicate that the abandoned explanations are less credible, too. With this ready-made response, striking parties would offer new explanations at their own peril. Thus, barring lower courts from even considering post hoc justifications for a strike deprives trial courts of potentially powerful evidence that the strike was, in fact, racially motivated. In effect, the majority's automatic evidentiary bar ultimately harms the truth-seeking process that *Batson* was designed to effectuate.

¶84    Moreover, imposing this bar diminishes the "'pivotal role' of the trial court" in the *Batson* regime. *See Wilson*, ¶ 18, 351 P.3d at 1133 (quoting *Snyder*, 552 U.S. at 477). Trial courts have a "duty to distinguish between sham excuses that violate the Equal Protection Clause and bona fide, race-neutral explanations for a peremptory strike." *Id.* (first citing *Hernandez v. New York*, 500 U.S. 352, 365 (1991); and then citing *Batson*, 476 U.S. at 98 n.21). And trial courts are best positioned to fulfill that duty; only the trial court can assess the nonverbal demeanor of the parties and prospective jurors. *Id.* Recognizing this, we've invalidated judicially created presumptions at *Batson*'s third step, warning that such presumptions "arrogate[] the trial court's step-three duty" to sort legitimate conduct from discrimination. *Id.* (invalidating a judicially created presumption that "any justification unsupported by the record" is pretext). Simply said, presumptions

like these are inappropriate because they put a thumb on the scale of decisions best left for trial courts to decide in the first instance. *See id.*

¶85 We should recognize this same principle today—a presumption that any post hoc explanation is invalid, merely due to its timing, commandeers the trial court's duty to separate legitimate strikes from discriminatory ones. Undeterred, the majority puts its thumb on the scale: The mere fact that an explanation is "new," the majority concludes, means that courts cannot even consider it. Maj. op. ¶ 28.

¶86 But the line between a "new" explanation and an "old" explanation is not always crystal clear. This case provides an excellent example. The prosecutor here explained at trial that she struck J.T., in part, because he was "completely nonresponsive." On remand, she explained that she hadn't meant J.T. was literally nonresponsive (i.e., he hadn't refused to answer questions), but that "unengaged is a better word." The prosecutor then explained that she had been "concerned that he really didn't want to be here for some reason," that he wasn't "engaging with [her]," and that he sighed and was slow to take his seat when his number was called. It's unclear what else the prosecutor could have done to explain what "completely nonresponsive" meant, short of repeating herself verbatim. Could she have introduced written notes she contemporaneously made at trial reflecting her concerns? Could her trial co-counsel have testified that she also thought J.T.

13

was unengaged, or that she noticed any of the above behaviors? In these circumstances, the line between "completely nonresponsive" and "unengaged" is not immediately apparent. But under the majority's holding, the two justifications are *so* distinct that the latter is categorically forbidden. Maj. op. ¶ 52. Because a trial court's failure to precisely draw the line between "new" and "old" evidence now amounts to reversible error, *see* Maj. op. ¶ 63, confusion on this issue seems inevitable.

¶87 In an attempt to provide some guidance, the majority explains that a remand court's decision as to whether evidence is "new" should be reviewed for an abuse of discretion. Maj. op. ¶ 57 n.5; *see also People v. Moore*, 2021 CO 26, ¶ 26, 485 P.3d 1088, 1095 ("A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair."). But if that's so, this case is over. The remand court here decided that the explanation the People offered on remand was "generally consistent with the race-neutral reason — or reasons that they advanced during jury selection." Following the prosecutor's testimony, the remand court "found [her] to be credible"; noted that "[t]he People's race-neutral reasons are, number one, that [J.T.] was nonresponsive, a term they say they used as a synonym to unengaged or nonparticipatory"; and observed that when the prosecutor said J.T. was nonresponsive, the court had "understood the People to be concerned about [J.T.'s] responsiveness to [the prosecutor]," including "his attitude about the

14

prospect of being selected to serve on the jury." Those findings are supported by the record. Therefore, I see no reason to conclude that this determination was manifestly arbitrary—it was, after all, based on the remand court's first-hand observations and credibility determinations.[2] So even if the majority's test applies, we shouldn't grant a new trial here.

¶88 In sum, *Batson*'s third step requires trial courts to consult "all of the circumstances that bear upon the issue of racial animosity." *Snyder*, 552 U.S. at 478. As the Supreme Court's own analyses demonstrate, this includes any post hoc explanations for the strike, in addition to the possibly pretextual timing of those explanations. *See Foster*, 578 U.S. at 507–11; *Miller-El*, 545 U.S. at 245–46. By creating an evidentiary bar instead, the majority departs from that framework. This is unnecessary because parties are well equipped to point out the pretextual timing of an opponent's shifting explanations, and the trial court is equally well equipped to recognize racial discrimination. Accordingly, I respectfully dissent.

¶89 Because I would not find a blanket prohibition on new explanations, this case is not fully resolved in my view. The division below concluded that the remand court erred by accepting new race-neutral justifications, so it did not need

---

[2] The majority concludes that this determination was "manifestly unreasonable" without further analysis. *See* Maj. op. ¶ 57 n.5. In my view, that's insufficient.

to address Madrid's remaining arguments; for instance, that the remand court erred by concluding there were no similarly situated jurors as J.T. *Madrid*, ¶¶ 29–30, 44, 494 P.3d at 630, 633. I would therefore remand this case to the division to address those claims under the clear error standard imposed by *Batson*'s third step, bearing in mind that it should consult all of the circumstances that pertain to the issue of racial discrimination.