1
 2024 CO 55 Reginald Keith Clark, Petitioner v. The People of the State of Colorado. Respondent No. 22SC313
Supreme Court of Colorado, En Banc
July 1, 2024
 
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 19CA340
 
 
          
 Attorneys for Petitioner: Megan A. Ring, Public Defender
 Casey Mark Klekas, Deputy Public Defender
 
 
          
 Attorneys for Respondent: Philip J. Weiser, Attorney General
 Patrick A. Withers, Senior Assistant Attorney General
 
 
          
 Attorneys for Amici Curiae Colorado Hispanic Bar Association,
 Asian Pacific American Bar Association, South Asian Bar
 Association of Colorado, and Sam Cary Bar Association: Lewis
 Roca Rothgerber Christie LLP Kendra N. Beckwith Tyler J. Owen
 
 2
 
          
 Attorneys for Amici Curiae Colorado-Montana-Wyoming Area
 Conference of the National Association for the Advancement of
 Colored People and American Civil Liberties Union of
 Colorado: Martina Tiku Anna Kathryn Barnes
 
 
          
 Timothy R. Macdonald Anna I. Kurtz
 
 
          
 Attorneys for Amicus Curiae Mountain States Legal Foundation:
 William E. Trachman James L. Kerwin
 
 
          
 Attorneys for Amici Curiae Office of the Alternate Defense
 Counsel and Colorado Criminal Defense Bar: Law Offices of Ann
 M. Roan, LLC Ann M. Roan
 
 
          
 JUSTICE MÁRQUEZ delivered the Opinion of the Court, in
 which CHIEF JUSTICE BOATRIGHT, JUSTICE HART, JUSTICE SAMOUR,
 and JUSTICE BERKENKOTTER joined. JUSTICE HOOD, joined by
 JUSTICE GABRIEL, dissented.
 
 3
 
          
 OPINION
 
 
          
 MÁRQUEZ, JUSTICE
 
 
          ¶1
 Racial discrimination, while detestable in any context, is
 "especially pernicious" in the criminal justice
 system. Rose v. Mitchell, 443 U.S. 545, 555 (1979).
 "[S]uch discrimination 'not only violates our
 Constitution and the laws enacted under it but is at war with
 our basic concepts of a democratic society and a
 representative government.'" Id. at 556
 (quoting Smith v. Texas, 311 U.S. 128, 130 (1940)).
 Criminal defendants have the right to an impartial jury, U.S.
 Const. amend. VI; Colo. Const. art. II, § 16, which
 includes the right to be tried by jurors who can consider the
 case without the influence of racial animus, Georgia v.
 McCollum, 505 U.S. 42, 58 (1992). The jury, after all,
 is meant to be "a criminal defendant's fundamental
 'protection of life and liberty against rac[ial] . . .
 prejudice.'" Pena-Rodriguez v. Colorado,
 580 U.S. 206, 223 (2017) (quoting McCleskey v. Kemp,
 481 U.S. 279, 310 (1987)).
 
 
          ¶2
 Procedures for preventing biased jurors from serving are
 critical to the protection of the defendant's right to an
 impartial jury. McCollum, 505 U.S. at 58. In
 Colorado, judges must dismiss for cause jurors who
 "evinc[e] enmity or bias toward the defendant or the
 state." § 16-10-103(1)(j), C.R.S. (2023). Where a
 trial court's erroneous denial of a challenge for cause
 results in seating a juror who is biased against the
 defendant, the defendant's Sixth Amendment right to an
 
 4
 
 impartial jury is violated, and the conviction must be
 reversed. People v. Abu-Nantambu-El, 2019 CO 106,
 ¶ 29, 454 P.3d 1044, 1050.
 
 
          ¶3
 If, however, a juror evinces racial bias during voir dire but
 does not ultimately serve on the jury, no Sixth Amendment
 violation has occurred. These are the circumstances we are
 presented with today.
 
 
          ¶4
 Reginald Keith Clark, a Black man, was charged with multiple
 crimes arising from his alleged sexual assault of A.B., a
 white woman. He faced trial in Gilpin County, an area that is
 predominantly white.[1] During voir dire, a venire member made
 comments that Clark believed evinced racial bias. Clark moved
 to strike the juror for cause, but the trial court denied the
 challenge, concluding that the juror's statements
 expressed a political view and did not indicate that he could
 not be fair. Clark later removed the juror using a peremptory
 challenge. Thus, the juror did not sit on the jury. Clark was
 convicted and appealed on multiple grounds.
 
 
          ¶5
 In a divided opinion, the court of appeals affirmed
 Clark's conviction. People v. Clark, 2022 COA
 33, ¶ 1, 512 P.3d 1074, 1076. In its discussion of the
 trial
 
 5
 
 court's ruling on the challenge for cause, the
 division's lead opinion focused its analysis on the Sixth
 Amendment. Id. at ¶¶ 22-32, 512 P.3d at
 1079-80. Judge Schutz's partial dissent included a
 discussion of the Equal Protection Clause, particularly
 within the context of Batson v Kentucky, 476 U.S. 79 (1986),
 and its progeny Clark, ¶¶ 89-102, 512 P.3d at
 1089-92 (Schutz, J, concurring in part and dissenting in
 part). We granted Clark's petition for certiorari review
 of two issues.[2]
 
 
          ¶6
 First, we consider whether the trial court's denial of
 Clark's for-cause challenge may be analyzed for
 harmlessness or instead constitutes structural error
 requiring reversal. In light of Supreme Court and Colorado
 precedent, we conclude that, because any error by the trial
 court was made in good faith and because the juror never
 actually sat on the jury, Clark's Sixth Amendment right
 to an impartial jury was not violated. Accordingly, the trial
 court's erroneous denial of the challenge for cause in
 this case did not result in structural error and automatic
 reversal is not required. And because no state actor
 purposefully
 
 6
 
 discriminated against Clark (or anyone else) on the basis of
 race, no equal protection violation occurred either.
 
 
          ¶7
 Second, we separately conclude that a juror's comment
 about her previous jury experience recalling a judge's
 alleged statement that the jury must deliberate until it
 reached a unanimous verdict does not constitute
 "extraneous prejudicial information" under CRE
 606(b).
 
 
          ¶8
 Accordingly, we affirm the judgment of the court of appeals
 and uphold Clark's conviction.
 
 
          I.
 Facts and Procedural History
 
 
          ¶9
 In November 2017, Clark approached A.B. in his car as she was
 walking through downtown Denver to catch a bus. Clark offered
 A.B. a ride. A.B., who recognized Clark, accepted. A.B. asked
 Clark to take her to a nearby location, but Clark instead
 drove into the mountains near Black Hawk.
 
 
          ¶10
 During the drive, Clark stopped and sexually assaulted A.B.
 Shortly after this, A.B. ran away. Police officers later
 contacted her on the side of the road. A.B. told them about
 the assault and described her assailant. Soon after, the
 officers spotted Clark driving in the vicinity and arrested
 him.
 
 
          ¶11
 Clark was charged in Gilpin County with second degree
 kidnapping, § 18-3-302(1), (3), C.R.S. (2023); sexual
 assault with a deadly weapon, § 18-3-402(1)(a),
 (5)(a)(III), C.R.S. (2023); sexual assault caused by threat
 of
 
 7
 
 imminent harm, § 18-3-402(1)(a), (4)(b); and sexual
 assault achieved through the application of physical force,
 § 18-3-402(1)(a), (4)(a). The case proceeded to a jury
 trial.
 
 
          A.
 Voir Dire
 
 
          ¶12
 During voir dire, defense counsel raised the issue of race,
 noting that Clark was the only Black individual in the
 courtroom. One potential juror commented that if she were in
 Clark's position, she might doubt the fairness of the
 trial and "would like to see a little more
 diversity" in the courtroom. Other potential jurors
 agreed that some people in Gilpin County might have
 stereotypes about Black men. Soon after, the conversation
 moved away from the topic of diversity. A few minutes later,
 defense counsel asked Juror K about his thoughts related to
 the presumption of innocence, inquiring whether he thought
 the prosecution "start[ed] off . . . with a little bit
 of a lead," given that Clark was charged with a crime.
 Juror K responded by returning to the topic of diversity,
 saying:
 
 
 You've said a lot, and I'm trying to think through
 each thing.... I apologize for some of my thoughts.... The
 diversity and stuff, yes, it's obvious there's a
 [B]lack gentleman over there. This is Gilpin County. I moved
 to Gilpin County. I didn't want diversity. I want to be
 diverse up on top of a hill. That's—I hear the
 things, that diversity makes us stronger and things like
 that. I don't quite believe it in life from what my
 personal experiences are. And I can't change that. I can
 look and judge what is being said by your side and their side
 and be fair, but I can't change that—when I walked
 in here seeing a [B]lack gentleman here. And I can't say
 that the prosecutor has a leg up on this or something until I
 hear what's happened.
 
 8
 
          ¶13
 At a bench conference, Clark challenged Juror K for cause. As
 Clark later explained,[3] his basis for the challenge was that Juror
 K's statements about diversity were unprompted and
 reflected "actual bias and prejudice." Following
 this challenge, the court asked Juror K additional questions:
 
 
 Court: So here's kind of the two-part bottom line .... If
 you're chosen as a juror in this case, and if you're
 back in the jury room and you think the prosecution
 hasn't proven its case, would you have any trouble
 finding this defendant to be not guilty?
 
 
 Juror K: Not at all.
 
 
 Court: And the other side of that coin, what if you're
 back there and you say that [the] prosecutor has proven his
 case, would you have any trouble finding the defendant to be
 guilty?
 
 
 Juror K: Again, the same answer. Not at all.
 
 
          ¶14
 The court denied the challenge, and later provided its
 reasoning that Juror K's statements "that he
 didn't think that diversity was a good thing"
 expressed "a political view" and did not
 "answer the question of whether he can be a fair
 juror." The judge observed that "a person can
 certainly have offensive views and still apply the law. Those
 two things are really separate in my mind."
 
 9
 
          ¶15
 After his challenge for cause was denied, Clark exercised all
 of his allotted peremptory strikes, using his first to remove
 Juror K. Juror K was excused and did not sit on the jury.
 
 
          B.
 Statements Made During Jury Deliberations
 
 
          ¶16
 After deliberating for approximately seventeen hours over
 three days, the jury convicted Clark of second degree
 kidnapping and sexual assault caused by threat of imminent
 harm. The court sentenced Clark to eighteen years for the
 kidnapping conviction and a consecutive term of twelve years
 to life for the sexual assault.
 
 
          ¶17
 Following the verdict, Clark filed a motion for a new trial
 based on an affidavit from Juror LL. The affidavit explained
 that the jury was deadlocked for the first two days of
 deliberations. Juror LL alleged that on the third day of
 deliberations, another juror
 
 
 mentioned a previous jury they [sic] she served on, in which
 the jury was told by the judge "I don't want a hung
 jury, and I want you guys to stay as long as you need to
 become unanimous." That juror stated that she was told
 in the previous trial by the judge that the jury must
 deliberate until a unanimous verdict was reached.... The
 original juror who referenced her previous jury service,
 presented that information as the factual information about
 the law that the jury was required to reach a unanimous
 verdict.
 
 
          ¶18
 Juror LL further alleged that the other juror's statement
 sparked fears among the other jurors about the impact that
 protracted deliberations would have
 
 10
 
 on their personal and professional lives, and, as a result,
 many jurors—including her—voted guilty to avoid
 those ramifications.
 
 
          ¶19
 Based on this information, Clark requested a new trial or,
 alternatively, an evidentiary hearing. As relevant here,
 Clark argued that Juror LL's affidavit was admissible
 under the extraneous prejudicial information exception to CRE
 606(b). The court disagreed, concluding that the affidavit
 did not allege the introduction of "extraneous
 prejudicial information" for purposes of meeting the
 exception to CRE 606(b), which otherwise prohibits a juror
 from testifying as to any statements made during jury
 deliberations. Consequently, the court concluded it could not
 consider the statements in the juror's affidavit. It
 therefore denied Clark's motion.
 
 
          C.
 The Court of Appeals' Decision
 
 
          ¶20
 Clark appealed his conviction, and in a divided opinion, the
 court of appeals affirmed. Clark, ¶ 1, 512 P.3d
 at 1076.
 
 
          ¶21
 With respect to the challenge for cause, the division split
 three ways. Judges Fox and Schutz agreed with Clark that the
 trial court erred when it denied Clark's challenge for
 cause of Juror K. Id. at ¶ 21, 512 P.3d at
 1079; id. at ¶ 78, 512 P.3d at 1086-87 (Schutz,
 J., concurring in part and dissenting in part). Judge Dailey
 would have given more deference to the trial court's
 ruling and thus disagreed that the trial court erred in this
 case. Id. at ¶ 62, 512 P.3d at 1084 (Dailey,
 J., concurring in the judgment).
 
 11
 
          ¶22
 Regarding the remedy, the lead opinion, authored by Judge
 Fox, concluded that, under this court's decision in
 People v. Novotny, 2014 CO 18, 320 P.3d 1194, the
 trial court's erroneous denial of Clark's for-cause
 challenge did not amount to structural error. Clark,
 ¶ 26, 512 P.3d at 1079. Judge Fox disagreed with
 Clark's argument that the trial court's error fell
 within Novotny's exception for errors made in
 "other than good faith." Id. at
 ¶¶ 27-28, 512 P.3d at 1080. Judge Fox also rejected
 Clark's argument that the trial court's error forced
 him to use a peremptory challenge to remove Juror K and thus
 deprived him of equal protection of the law. Id. at
 ¶¶ 29-32, 512 P.3d at 1080. Judge Fox reasoned that
 this argument was foreclosed by this court's decision in
 Vigil v. People, 2019 CO 105, 455 P.3d 332.
 Clark, ¶ 31, 512 P.3d at 1080. Accordingly,
 Judge Fox concluded that the trial court's error should
 be analyzed for harmlessness and, because Juror K did not
 actually participate in the jury, the error was necessarily
 harmless. Id. at ¶ 32, 512 P.3d at 1080. Judge
 Dailey concurred in the judgment. He agreed that under
 Novotny, any error by the trial court in denying the
 for-cause challenge did not warrant a new trial. Id.
 at ¶ 61, 512 P.3d at 1084 (Dailey, J., concurring in the
 judgment).
 
 
          ¶23
 In a partial dissent, Judge Schutz agreed with Clark that the
 error was structural and required automatic reversal.
 Id. at ¶ 79, 512 P.3d at 1087 (Schutz, J.,
 concurring in part and dissenting in part). In his view, this
 case presented an
 
 12
 
 exception to Novotny's outcome-determinative
 analysis. Id. at ¶¶ 85-86, 512 P.3d at
 1088.
 
 
          ¶24
 According to Judge Schutz, the trial court's
 "tolerance" of Juror K's express racial bias
 amounted to structural error, not because it violated
 Clark's right to an impartial jury, but because it
 violated his right to equal protection. Id. at
 ¶ 95, 512 P.3d at 1090. In reaching this conclusion,
 Judge Schutz drew comparisons to the Supreme Court's
 opinion in Batson, a case addressing racial bias in
 the jury selection process through the discriminatory use of
 peremptory challenges:
 
 
 While the structural error created by Batson
 typically arises through the exercise of a peremptory
 challenge, the equal protection violation is even more
 pronounced in the context of a trial court's failure to
 grant a challenge for cause against a juror who has confirmed
 his racial bias against a defendant. In such situations,
 racial bias in the jury selection process need not be
 assumed, it has been openly acknowledged to the court, the
 parties, and the public. If the injection of assumed bias
 into the jury selection process through the exercise of a
 peremptory challenge creates structural error, then surely
 the trial court's tolerance of a prospective juror's
 express racial bias after that bias has been brought to the
 court's attention through a challenge for cause also
 constitutes structural error.
 
 
 Id. at ¶ 95, 512 P.3d at 1090.
 
 
          ¶25
 Judge Schutz further reasoned that Batson was
 designed to serve multiple ends, including circumstances like
 this where, as he saw it, the trial court's error sent a
 message that racial bias may be tolerated in the criminal
 justice system. Id. at ¶¶ 96, 98, 512 P.3d
 at 1090-91. Whereas Judge Fox's opinion evaluated the
 challenge-for-cause error through a Sixth Amendment lens,
 Judge Schutz viewed
 
 13
 
 the issue as implicating a defendant's Fourteenth
 Amendment right to equal protection because the juror's
 bias against the defendant was based on race. Id. at
 ¶¶ 100-02, 512 P.3d at 1091-92. In other words,
 Judge Schutz equated Batson's reference to
 "racial bias in the jury selection process" with a
 potential juror's expression of racial bias against the
 defendant during voir dire. See id. at ¶¶
 95-102, 512 P.3d at 1090-92.
 
 
          ¶26
 As for Juror LL's affidavit, the majority decided that
 the trial court correctly determined that the statements it
 contained did not constitute extraneous prejudicial
 information and therefore did not meet the exception to CRE
 606(b).[4]Id. at ¶ 59, 512 P.3d at 1084
 (majority opinion). Relying on People v. Newman,
 2020 COA 108, 471 P.3d 1243, the division majority concluded
 that "extraneous prejudicial information" consists
 of (1) legal content and specific factual information (2)
 learned from outside the record (3) that is relevant to the
 issues in a case. Clark, ¶ 52, 512 P.3d at
 1083. The majority declined to construe the phrase
 "relevant to the issues in a case" so broadly as to
 include a general statement about how juries handle
 protracted deliberations. Id. at ¶ 58, 512 P.3d
 at 1084. Such a
 
 14
 
 broad construction, the majority reasoned, would be
 inconsistent with the purposes of CRE 606(b) and Colorado
 precedent. Id.
 
 
          ¶27
 We granted Clark's petition for certiorari review on
 these two issues and now address them in turn.
 
 
          II.
 Analysis
 
 
          ¶28
 We first address Clark's argument that the trial
 court's denial of his for-cause challenge to Juror K
 amounted to structural error and required automatic reversal.
 Applying our precedent, we conclude that any error by the
 trial court was made in good faith, and because Juror K did
 not actually serve on the jury, the court's error was
 harmless.
 
 
          ¶29
 We then turn to the second issue before us—whether the
 statements in Juror LL's affidavit constitute
 "extraneous prejudicial information" for purposes
 of CRE 606(b). We conclude that the juror's comment
 recounting a judge's statement about jury deliberations
 during a past jury experience was not legal content relevant
 to Clark's case. Accordingly, we hold that the
 information was not extraneous prejudicial information for
 purposes of the exception to Rule 606(b).
 
 15
 
          A.
 The Erroneous Denial of a For-Cause Challenge to a Biased
 Juror Is Harmless When It Is Cured Through the Use of a
 Peremptory Strike
 
 
          ¶30
 The division determined that the trial court's denial of
 Clark's for-cause challenge to Juror K was an abuse of
 discretion. Clark, ¶ 21, 512 P.3d at 1079. The
 People do not challenge this ruling. We therefore assume for
 the purpose of our analysis that the trial court erred when
 it denied the challenge for cause to Juror K. The question is
 whether this error is structural and requires automatic
 reversal or instead is subject to harmless-error analysis.
 
 
          ¶31
 Clark's primary argument, mirroring Judge Schutz's
 partial dissent, is that our decisions in Novotny
 and Vigil do not apply because the trial court's
 erroneous denial of his for-cause challenge to Juror K
 implicated his rights to equal protection under the
 Fourteenth Amendment. Alternatively, Clark argues that the
 trial court's error falls outside the general rule in
 Novotny and Vigil.
 
 
          ¶32
 We begin with a discussion of the applicable standard of
 review. Next, we review the distinction between structural
 error requiring automatic reversal and trial error that is
 analyzed for harmlessness. We then describe Supreme Court and
 Colorado precedent, including Novotny and
 Vigil, regarding the standard of reversal that
 applies to errors impacting the use of peremptory challenges.
 Consistent with that precedent, we conclude that the trial
 court's error is subject to harmless-error analysis. We
 also reject Clark's argument that the error
 
 16
 
 amounted to a violation of his equal protection rights.
 Accordingly, applying the harmless-error standard of
 reversal, we determine that any error by the trial court was
 harmless and does not warrant reversal.
 
 
          1.
 Standard of Review
 
 
          ¶33
 The determination of the proper standard of reversal to be
 applied in a case is a question of law that we review de
 novo. See A.R. v. D.R., 2020 CO 10, ¶ 37, 456
 P.3d 1266, 1276 (identifying de novo review as the proper
 standard of review for the determination of the proper legal
 standard to apply); Abu-Nantambu-El, ¶ 23, 454
 P.3d at 1050 (reviewing de novo which standard of reversal
 applies when a trial court erroneously denies a challenge for
 cause and the juror ultimately serves on the jury).
 
 
          2.
 Structural Errors and the Sixth Amendment
 
 
          ¶34
 "Certain constitutional rights are so basic to a fair
 trial that their violation can never be harmless."
 Abu-Nantambu-El, ¶ 27, 454 P.3d at 1050 (citing
 Gray v. Mississippi, 481 U.S. 648, 668 (1987)). Such
 errors have been deemed "structural errors" because
 they are not "'simply an error in the trial process
 itself,'" but rather "affect the 'framework
 within which the trial proceeds'"—that is, the
 very structure of the trial itself. People v.
 Fry, 92 P.3d 970, 980 (Colo. 2004) (quoting Blecha
 v. People, 962 P.2d 931, 942 (Colo. 1998)). Whereas
 ordinary errors in the trial process
 
 17
 
 may be deemed harmless, structural errors are incompatible
 with harmless error analysis. Id.
 
 
          ¶35
 We have held that when a trial court's error results in
 the seating of a juror who is biased against the defendant,
 the error is structural. Abu-Nantambu-El, ¶ 30,
 454 P.3d at 1050 (first citing United States v.
 Martinez-Salazar, 528 U.S. 304, 316 (2000); then citing
 Ross v. Oklahoma, 487 U.S. 81, 85 (1988); and then
 citing Morrison v. People, 19 P.3d 668, 670 (Colo.
 2000)). Such an error violates the defendant's right to
 "[a] fair and impartial jury[, which] is a key element
 of a defendant's constitutional right to a fair trial
 under both the United States and Colorado
 Constitutions." Id. at ¶ 14, 454 P.3d at
 1047 (first citing U.S. Const. amends. V, VI, XIV; then
 citing Colo. Const. art. II, §§ 16, 25; then citing
 Vigil, ¶ 9, 455 P.3d at 334; and then citing
 People v. Russo, 713 P.2d 356, 360 (Colo. 1986)).
 
 
          ¶36
 Both for-cause and peremptory challenges serve as means of
 securing this right. First, Colorado law requires a court,
 upon a party's challenge, to remove a juror for cause
 when particular circumstances implicate the juror's
 ability to remain impartial. Id. at ¶ 15, 454
 P.3d at 1048. Relevant here, section 16-10-103(1)(j) requires
 a trial court to excuse a juror who "evinc[es] enmity or
 bias toward the defendant or the state." Second, section
 16-10-104, C.R.S. (2023), permits both parties to exercise
 peremptory challenges, which allow the removal of
 "jurors whom they perceive as biased."
 Abu-Nantambu-El, ¶ 18, 454 P.3d at 1048
 
 18
 
 (quoting Vigil, ¶ 19, 455 P.3d at 337). The
 number of peremptory challenges available depends on the
 circumstances of the case and the nature of the charge.
 
 
          ¶37
 Prior to Novotny and Vigil, Colorado
 precedent required automatic reversal when a defendant used a
 peremptory strike to remove a prospective juror who should
 have been removed for cause and the defendant otherwise
 exhausted their peremptory challenges. People v.
 Macrander, 828 P.2d 234, 243 (Colo. 1992), overruled
 by Novotny, ¶ 27, 320 P.3d at 1203. We changed
 course in Novotny and Vigil in recognition
 of jurisprudential developments in the understanding of trial
 error and structural error that followed our decision in
 Macrander. See Novotny, ¶ 27, 320 P.3d
 at 1203 (concluding "that allowing a defendant fewer
 peremptory challenges than authorized, or than available to
 and exercised by the prosecution, does not, in and of itself,
 amount to structural error" and overruling prior
 holdings to the contrary); Vigil, ¶ 22, 455
 P.3d at 338 ("For virtually the same reasons we found it
 important and justified in Novotny to partially
 overturn this line of our own prior holdings, we consider it
 similarly justified to now overturn them in full. To the
 extent that our prior rationale was based on pre-harmless
 error holdings, the constitutional significance of peremptory
 challenges, and even federal due process implications of
 violating state peremptory challenge law, those premises have
 now all been independently swept away by developments in the
 
 19
 
 jurisprudence of the Supreme Court which we have either
 already adopted or by which we are constitutionally
 bound.").
 
 
          ¶38
 Novotny also relied on Supreme Court case law
 recognizing that peremptory strikes are rooted in state law,
 not the federal constitution. ¶¶ 14-17, 320 P.3d at
 1199-1200 (citing, inter alia, Rivera v.
 Illinois, 556 U.S. 148, 157 (2009)) (explaining that
 "the United States Supreme Court has now expressly
 rejected the understanding we, and a substantial number of
 other jurisdictions, had of the federal due process
 implications of" a state court depriving a defendant of
 a statelaw granted peremptory challenge); see also
 Martinez-Salazar, 528 U.S. at 311 ("[U]nlike the
 right to an impartial jury guaranteed by the Sixth Amendment,
 peremptory challenges are not of federal constitutional
 dimension."). Our decision in Vigil likewise
 emphasized that "neither the prosecution nor the
 defendant is granted any right in this jurisdiction, by
 constitution, statute, or rule, to shape the composition of
 the jury through the use of peremptory challenges," thus
 a "defendant could not [be] harmed by the deprivation of
 any such right." Vigil, ¶ 25, 455 P.3d at
 339.
 
 
          ¶39
 Accordingly, Vigil rejected the notion that a
 defendant who uses a peremptory strike to remove a juror for
 whom the trial court erroneously denied a for-cause challenge
 was effectively "forced" to use their peremptory
 strike. ¶ 21, 455 P.3d at 337-38 (citing
 Martinez-Salazar, 528 U.S. at 314-15);
 
 20
 
 see also Ross, 487 U.S. at 90-91 ("As required
 by [state] law, petitioner exercised one of his peremptory
 challenges to rectify the trial court's error, and
 consequently he retained only eight peremptory challenges to
 use in his unfettered discretion. But he received all that
 [state] law allowed him, and therefore his due process
 challenge fails.").
 
 
          ¶40
 Our decision in Novotny acknowledged that, aside
 from "an actual Sixth Amendment violation," there
 may be some circumstances in which an erroneous denial of a
 for-cause challenge does rise to the level of structural
 error, requiring automatic reversal. ¶¶ 23, 27, 320
 P.3d at 1202-03. Citing Martinez-Salazar, the court
 acknowledged that such reversible errors include violations
 of state law "committed in other than good faith."
 Id. at ¶ 23, 320 P.3d at 1202 (citing
 Martinez-Salazar, 528 U.S. at 316-17). In
 Martinez-Salazar, the Supreme Court held "that
 a defendant's exercise of peremptory challenges . . . is
 not denied or impaired when the defendant chooses to use a
 peremptory challenge to remove a juror who should have been
 excused for cause." Martinez-Salazar, 528 U.S.
 at 317. But in so doing, the Court noted that the case before
 it did not involve any assertion that the trial court
 "deliberately misapplied the law in order to force the
 defendants to use a peremptory challenge to correct the
 court's error." Id. at 316 (citation
 omitted) (citing Ross, 487 U.S. at 91 n.5).
 
 21
 
          ¶41
 Novotny thus contemplated two ways an erroneous
 denial of a for-cause challenge might rise to the level of
 structural error: (1) where the error resulted in a Sixth
 Amendment violation because the biased juror actually served
 on the jury, and (2) where the error involved a deliberate
 misapplication of the law intended to disadvantage the
 defendant.
 
 
          ¶42
 The law in Colorado following Novotny and
 Vigil is clear: when a defendant uses a peremptory
 challenge to correct a trial court's erroneous denial of
 a challenge for cause, "so long as the defendant
 receives both an impartial jury and the number of peremptory
 challenges specified by state statute, the defendant's
 constitutional rights remain unaffected."
 Abu-Nantambu-El, ¶ 20, 454 P.3d at 1049;
 see also Novotny, ¶¶ 23, 27, 320 P.3d at
 1202-03. Absent bad faith, any such error that does not
 result in the biased juror actually participating on the jury
 is necessarily harmless. Abu-Nantambu-El, ¶ 20,
 454 P.3d at 1049.
 
 
          ¶43
 Here, Clark was permitted to use his statutorily allotted
 number of peremptory challenges. Juror K did not serve on the
 jury for Clark's trial, and Clark does not allege that
 any biased juror otherwise evaded removal. Under
 Novotny and Vigil, any error by the trial
 court in denying the challenge for cause to Juror K was
 harmless.
 
 
          ¶44
 Clark nevertheless argues that the trial court's error
 deprived him of a peremptory challenge because he was forced
 to use one to cure the trial court's
 
 22
 
 error. But as Judge Fox noted below, this argument is
 foreclosed by our reasoning in Vigil and the Supreme
 Court's decision in Martinez-Salazar, which
 expressly rejected this argument. Clark, ¶ 31,
 512 P.3d at 1080; Vigil, ¶ 21, 455 P.3d at 337;
 Martinez-Salazar, 528 U.S. at 314-15. Clark's
 choice to exercise a peremptory challenge against Juror K was
 an exercise of the full guarantee of what he was granted by
 statute.
 
 
          ¶45
 Clark also argues that the trial court's error was not
 made in good faith and thus Novotny and
 Vigil's general rule for peremptory challenges
 does not apply. But nothing in the record indicates that the
 court deliberately misapplied the law in order to force Clark
 to sacrifice a peremptory challenge, and Clark alleges no
 facts that indicate the trial court otherwise acted in bad
 faith.
 
 
          ¶46
 In sum, any error by the trial court in this case did not
 result in a biased juror participating in Clark's trial,
 and Clark has not shown that any error was otherwise
 deliberate or made in bad faith.
 
 
          3.
 The Trial Court's Error Did Not Violate Clark's Right
 to Equal Protection
 
 
          ¶47
 Mirroring Judge Schutz's partial dissent, Clark argues
 that because Juror K expressed racial bias against
 him, the trial court's denial of Clark's for-cause
 challenge violated Clark's right to equal protection
 under the Fourteenth Amendment, and that the court's
 error amounted to structural error. Because Clark cannot
 establish a violation of his right to equal protection, we
 disagree.
 
 23
 
          a.
 Bias in Jury Selection and the Equal Protection
 Clause
 
 
          ¶48
 The Equal Protection Clause of the Fourteenth Amendment
 prohibits the state from denying "any person within its
 jurisdiction the equal protection of the laws." U.S.
 Const. amend. XIV, § 1. The "central purpose"
 of the Equal Protection Clause is "the prevention of
 official conduct discriminating on the basis of race."
 Washington v. Davis, 426 U.S. 229, 239 (1976).
 Accordingly, proof of an equal protection violation requires
 a showing of (1) purposeful discrimination, (2)
 attributable to the state. Id.;
 Edmonson v. Leesville Concrete Co., 500 U.S. 614,
 619 (1991).
 
 
          ¶49
 Beginning with Swain v. Alabama, 380 U.S. 202
 (1965), the Supreme Court has issued several decisions
 concerning the application of the Equal Protection Clause in
 the context of jury selection. Perhaps most notably, in
 Batson, the Court held that the Constitution forbids
 racial discrimination in jury selection—specifically,
 the state may not exercise peremptory challenges to
 purposefully or deliberately exclude persons from
 participating in a jury on account of their race.
 Batson, 476 U.S. at 84 (citing Swain, 380
 U.S. at 203-04). Batson established a three-step
 analysis designed to determine whether a peremptory strike
 reflected purposeful discrimination. People v.
 Ojeda, 2022 CO 7, ¶ 21, 503 P.3d 856, 862; see
 also Batson, 476 U.S. at 93 ("As in any equal
 protection case, the 'burden is, of course,' on the
 defendant who alleges discriminatory selection of the venire
 'to prove the
 
 24
 
 existence of purposeful discrimination.'") (quoting
 Whitus v. Georgia, 385 U.S. 545, 550 (1967)).
 
 
          ¶50
 Although Clark leans into the Batson framework to
 argue against racial bias in the jury trial context, he fails
 to articulate how the Batson framework applies to
 the challenge for cause to Juror K. The Batson
 framework addresses racial bias in the jury selection process
 by prohibiting the discriminatory use of peremptory
 challenges to remove jurors on the basis of race. Clark's
 argument focuses on a completely different kind of
 "racial bias in the jury selection
 process"—namely, a potential juror's
 expression of racial bias during voir dire. But the
 Batson framework was not designed to address the
 issue of juror bias, which implicates the
 defendant's Sixth Amendment right to an impartial jury.
 Instead, Batson and its progeny rest on the
 defendant's "right to be tried by a jury whose
 members are selected by nondiscriminatory criteria."
 Powers v. Ohio, 499 U.S. 400, 404 (1991).
 
 
          ¶51
 In his separate opinion, Judge Schutz noted that the
 Batson framework "was designed 'to serve
 multiple ends,' only one of which was to protect
 individual defendants from discrimination in the selection of
 jurors." Clark, ¶ 96, 512 P.3d at 1090
 (Schutz, J., concurring in part and dissenting in part)
 (quoting Powers, 499 U.S. at 406). But the Supreme
 Court's Batson cases all focus on the harms that
 derive from the discriminatory use of peremptory challenges.
 See Powers, 499 U.S. at 406. For example, a
 defendant is denied equal protection of the laws when tried
 
 25
 
 by a jury from which members of the defendant's race have
 been purposefully excluded. Id. at 404. In addition,
 the discriminatory use of peremptory challenges harms the
 excluded jurors and the community at large. Id.;
 see also McCollum, 505 U.S. at 48-49 (acknowledging
 that the harm that flows from discriminatory jury selection
 also undermines public confidence in the integrity of the
 criminal justice system). But the various harms addressed by
 Batson all stem from discrimination in the selection
 of jurors—specifically, discrimination in the
 discretionary exercise of peremptory challenges. Because
 Clark's argument does not concern purposeful
 discrimination in the selection of jurors, his reliance on
 the Batson framework is misplaced.
 
 
          ¶52
 Even aside from the obvious factual distinctions between
 Batson cases and the circumstances here, Clark fails
 to allege any equal protection violation. As explained above,
 the Equal Protection Clause prohibits state actors
 from purposefully discriminating on the basis of
 race. Clark argues that, by "tolerating" Juror
 K's continued presence on the jury despite his racially
 biased comments, the court denied Clark equal protection of
 the law.
 
 
          ¶53
 To support his contention that the tolerance of racial bias
 constitutes an equal protection violation, Clark cites
 McCollum. In McCollum, the Court addressed
 whether to extend the Batson framework to apply to a
 criminal defendant's "purposeful racial
 discrimination in the exercise of peremptory
 
 26
 
 challenges." 505 U.S. at 46-48 (emphasis added). The
 issue of whether purposeful discrimination occurred was not
 at issue—in fact, that issue would be determined, if
 the framework applied, through the Batson analysis
 itself. Id. at 59.
 
 
          ¶54
 Accordingly, the McCollum Court's analysis began
 with the question of whether the purposefully discriminatory
 exercise of peremptory challenges by the defense
 causes the same kind of harm addressed by Batson.
 The Court concluded that it did, stating: "'[B]e it
 at the hands of the State or the defense,' if a court
 allows jurors to be excluded because of group bias, '[it]
 is [a] willing participant in a scheme that could only
 undermine the very foundation of our system of
 justice—our citizens' confidence in it.'"
 505 U.S. at 49-50 (alterations in original) (quoting
 State v. Alvarado, 534 A.2d 440, 442 (N.J.Super.
 Ct. Law Div. 1987)).
 
 
          ¶55
 Clark relies on this language to support his contention that
 a court's tolerance of racial bias is, standing alone,
 sufficient to establish an equal protection violation. But
 the quote from McCollum provides no such support.
 Whether conduct was purposefully discriminatory was not at
 issue in McCollum; thus, the quoted language has no
 relevance to that element of an equal protection violation
 claim. The language is likewise irrelevant to the
 determination of whether there was state action. In fact, the
 court immediately followed the quoted language by saying:
 
 
 The fact that a defendant's use of discriminatory
 peremptory challenges harms the jurors and the community
 does not end our equal
 
 27
 
 protection inquiry. Racial discrimination, although
 repugnant in all contexts, violates the Constitution only
 when it is attributable to state action. Thus, the
 second question that must be answered is whether a criminal
 defendant's exercise of a peremptory challenge
 constitutes state action for purposes of the Equal Protection
 Clause.
 
 
 505 U.S. at 50 (citation omitted) (emphases added).
 
 
          ¶56
 To the extent Clark contends that the trial court's
 ruling unnecessarily required him to use a peremptory
 challenge on the basis of his race, we disagree. Clark
 analogizes the trial court's ruling to a hypothetical
 statute that provides Black defendants with one less
 peremptory challenge than white defendants. While such a
 statute would surely violate the Equal Protection Clause, no
 comparable purposeful discrimination occurred here. As
 discussed above, nothing in the record suggests that the
 trial court purposely denied Clark's challenge for cause
 to force Clark to expend a peremptory challenge. Were that
 true, the court's error would not have been made in good
 faith and would therefore be excepted from
 Novotny's general rule.
 
 
          ¶57
 Finally, Clark contends that the trial court's denial of
 his challenge for cause to Juror K amounts to structural
 error because the impacts of the error reflect the concerns
 articulated by the Supreme Court in Weaver v.
 Massachusetts, 582 U.S. 286 (2017). There, the Court
 articulated three broad rationales for deeming an error
 structural, namely where (1) the right at issue protects some
 interest other than preventing the defendant's erroneous
 conviction; (2) "the effects of the error are
 
 28
 
 simply too hard to measure," making it "almost
 impossible" for the government to prove the error was
 harmless beyond a reasonable doubt; or (3) the error always
 results in fundamental unfairness and thus any effort by the
 government to show harmlessness "would be futile."
 Id. at 295-96.
 
 
          ¶58
 As we have explained, structural errors are a narrow class of
 constitutional errors. Because Clark has not established a
 constitutional violation, any error by the trial court cannot
 be deemed structural. Regardless, the error here did not
 result in the type of harm contemplated by Weaver.
 Clark focuses on the impact of the judge's decision on
 the potential jurors' perception of the judiciary, saying
 that the denial "sent an intolerable message." As a
 factual matter, this claim is unsupported.
 
 
          ¶59
 Crucially, there is no evidence that the jury was aware of
 the challenge, let alone the court's ruling or its
 reasoning. The challenge and the ruling were made during a
 bench conference, out of the potential jurors' hearing.
 And when the trial court provided its reasoning on the record
 after the fact, all of the jurors had been dismissed from the
 room. Ultimately, the only events the jurors witnessed were
 Juror K's comments during voir dire and Juror K's
 subsequent dismissal. If there was any reasonable conclusion
 to draw about the permissibility of racial bias in the
 courtroom, it was that such expressions of bias result in
 dismissal, not that they are tolerated or welcomed.
 
 29
 
          ¶60
 Clark has thus failed to prove any cognizable harm, much less
 a constitutional error that rises to the level of structural
 error.
 
 
          4.
 The Trial Court's Erroneous Denial of Clark's
 For-Cause Challenge of Juror K Was Harmless and Does Not
 Require Reversal
 
 
          ¶61
 Because Novotny and Vigil govern the
 analysis here, we review the trial court's error for
 harmlessness to determine whether reversal is required.
 "Under this standard, reversal is required only if the
 error affects the substantial rights of the parties. That is,
 we reverse if the error 'substantially influenced the
 verdict or affected the fairness of the trial
 proceedings.'" Hagos v. People, 2012 CO 63,
 ¶ 12, 288 P.3d 116, 119 (citations omitted) (quoting
 Tevlin v. People, 715 P.2d 338, 342 (Colo. 1986)).
 
 
          ¶62
 Juror K did not actually serve on the jury in Clark's
 trial. Therefore, the trial court's denial of Clark's
 challenge to remove Juror K for cause did not substantially
 influence the verdict or affect the fairness of the trial
 proceedings. As explained above, the court's denial of
 his for-cause challenge did not "force" Clark to
 use one of his peremptory challenges or otherwise deprive him
 of the full allotment of peremptory challenges granted by
 statute to criminal defendants.
 
 
          ¶63
 To hold that an erroneous denial of a challenge for cause to
 a potential juror who has expressed racial bias is not
 structural error is not to say it is unimportant or
 inconsequential. However, where, as here, the defendant's
 use of a peremptory
 
 30
 
 challenge to remove the juror ensured that the biased juror
 did not ultimately sit on the jury, reversal of the
 defendant's conviction is not required because there was
 no violation of the right to an impartial jury or the right
 to equal protection. Where a good faith error does not end up
 impacting the defendant's trial, reversal is unwarranted.
 
 
          B.
 Juror LL's Affidavit
 
 
          ¶64
 Clark argues that Juror LL's affidavit describing
 statements made by another juror during deliberations
 constituted "extraneous prejudicial information"
 under CRE 606(b), and that he is therefore entitled to an
 evidentiary hearing to determine whether that information
 posed a reasonable possibility of prejudice. After setting
 forth the applicable standard of review, we discuss CRE
 606(b) and the requirements for a new trial based on a claim
 that the jury was exposed to extraneous prejudicial
 information. Applying this framework, we conclude that the
 statements mentioned in Juror LL's affidavit did not
 constitute "extraneous prejudicial information."
 
 
          1.
 Standard of Review
 
 
          ¶65
 Whether the statements in Juror LL's affidavit
 constituted "extraneous prejudicial information"
 under CRE 606(b) is a legal question we review de novo.
 See People v. Harlan, 109 P.3d 616, 624 (Colo.
 2005).
 
 31
 
          2.
 CRE 606(b)
 
 
          ¶66
 In order to promote "finality of verdicts, shield
 verdicts from impeachment, and protect jurors from harassment
 and coercion," id., Colorado law strongly
 disfavors any juror testimony impeaching a verdict,
 Kendrick v. Pippin, 252 P.3d 1052, 1063 (Colo. 2011)
 (citing Harlan, 109 P.3d at 624), abrogated on
 other grounds by Bedor v. Johnson, 2013 CO 4, 292 P.3d
 924. With certain exceptions not relevant here, see
 Pena-Rodriguez, 580 U.S. at 225, such testimony is
 generally prohibited, "even on grounds such as mistake,
 misunderstanding of the law or facts, failure to follow
 instructions, lack of unanimity, or application of the wrong
 legal standard," Harlan, 109 P.3d at 624
 (citing Hall v. Levine, 104 P.3d 222, 225 (Colo.
 2005)).
 
 
          ¶67
 CRE 606(b) codifies this general prohibition on inquiries
 into the validity of a verdict, stating that:
 
 
 a juror may not testify as to any matter or statement
 occurring during the course of the jury's deliberations
 or to the effect of anything upon his or any other
 juror's mind or emotions as influencing him to assent to
 or dissent from the verdict or indictment or concerning his
 mental processes in connection therewith.
 
 
 Rule 606(b) nevertheless allows inquiry into three narrow
 matters: "(1) whether extraneous prejudicial information
 was improperly brought to the jurors' attention, (2)
 whether any outside influence was improperly brought to bear
 upon any juror, or (3) whether there was a mistake in
 entering the verdict onto the
 
 32
 
 verdict form." Id. Under the Rule, a trial
 court may not receive a juror's affidavit concerning
 anything other than these three matters. Id.
 ("A juror's affidavit or evidence of any statement
 by the juror may not be received on a matter about which the
 juror would be precluded from testifying.").
 
 
          ¶68
 To set aside a verdict because of extraneous prejudicial
 information improperly brought to the jurors' attention,
 "a party must show both that extraneous information was
 improperly before the jury and that the extraneous
 information posed the reasonable possibility of prejudice to
 the defendant." Kendrick, 252 P.3d at 1063.
 
 
          ¶69
 The evaluation of whether the extraneous prejudicial
 information exception to CRE 606(b) applies proceeds in two
 steps. Harlan, 109 P.3d at 629.
 
 
          ¶70
 At step one, the court must determine whether the party
 alleging misconduct has presented competent evidence alleging
 that extraneous prejudicial information was improperly before
 the jury. Kendrick, 252 P.3d at 1063-64. At this
 step, the trial court must determine as a matter of law
 whether the alleged information before the jury constitutes
 prejudicial extraneous information. See Newman,
 ¶ 14, 471 P.3d at 1250. If the information does not
 constitute prejudicial extraneous information, the court may
 properly dismiss the motion for a new trial without a
 hearing.
 
 33
 
          ¶71
 If the information does constitute extraneous prejudicial
 information, the court must determine at step two (often
 following a hearing) whether there is a reasonable
 possibility that the extraneous prejudicial information
 influenced the verdict to the detriment of the defendant.
 Kendrick, 252 P.3d at 1063. The test at the second
 step applies an objective standard—the relevant
 question is whether there is a reasonable possibility of such
 impact. Harlan, 109 P.3d at 625.
 
 
          ¶72
 During the second step, the court should consider those
 factors articulated in our prior cases: (1) how the
 extraneous information related to critical issues in the
 case; (2) the degree of authority represented by the
 extraneous information; (3) how the information was acquired;
 (4) whether the information was shared with other jurors in
 the jury room; (5) whether the information was considered
 before the jury reached its verdict; and (6) whether there is
 a reasonable possibility that the information would influence
 a typical juror to the defendant's detriment.
 Id. at 630-31.
 
 
          ¶73
 Clark argues that consideration of whether the extraneous
 information relates to an issue before the jury pertains only
 to the prejudice analysis at step two and has no bearing on
 whether the information is "extraneous" at step
 one. We disagree.
 
 
          ¶74
 At step one, the court must determine whether the information
 qualifies as "extraneous prejudicial information."
 This step requires the court to determine if
 
 34
 
 the information was "prejudicial" (and not merely
 extraneous). By contrast, at step two, the inquiry is whether
 there is a reasonable possibility that the extraneous
 prejudicial information affected the jury's verdict to
 the detriment of the defendant. While the determination of
 whether the information is prejudicial at step one overlaps
 with the determination of whether there is a reasonable
 possibility that the information prejudiced the defendant at
 step two, the burden on the defendant at each step is
 different. At step one, "the party seeking impeachment
 must produce competent evidence to attack the verdict,"
 that is, evidence admissible under CRE 606(b) that calls into
 question the validity of the verdict. People v.
 Garcia, 752 P.2d 570, 583 (Colo. 1988). However, at step
 two, "the party must establish adequate grounds to
 overturn the verdict." Id.
 
 
          3.
 What Constitutes Extraneous Prejudicial Information?
 
 
          ¶75"
 [E]xtraneous prejudicial information consists of (1)
 'legal content and specific factual information' (2)
 'learned from outside the record' (3) that is
 'relevant to the issues in a case.'"
 Newman, ¶ 15, 471 P.3d at 1250 (quoting
 Kendrick, 252 P.3d at 1064). Like the division
 below, we find the thorough analysis of our case law provided
 in the court of appeals' opinion in Newman
 helpful.
 
 35
 
          a.
 Legal Content
 
 
          ¶76
 Extraneous prejudicial information can take the form of legal
 content or factual information. Clark argues that the
 statements at issue here introduced extraneous legal content.
 
 
          ¶77
 In evaluating what constitutes "legal content,"
 Newman evaluated four of our decisions for guidance.
 First, in Alvarez v. People, 653 P.2d 1127, 1131
 (Colo. 1982), this court held that it is improper for a juror
 to consult a dictionary definition of "reasonable"
 in order to "assist in understanding legal terminology
 in the court's instructions" on the reasonable doubt
 standard.
 
 
          ¶78
 Similarly, in both Niemand v. District Court, 684
 P.2d 931, 932 n.1 (Colo. 1984), and Wiser v. People,
 732 P.2d 1139, 1141 (Colo. 1987), this court determined that
 a juror's consultation of a dictionary to assist in
 understanding of elements of a crime was improper. In
 Niemand, the juror consulted Black's Law
 Dictionary to review the definitions of terms relevant to the
 second degree murder and manslaughter charges the defendant
 faced, including "malice,"
 "premeditation," and "second degree
 murder." 684 P.2d at 932. Similarly, in Wiser,
 the juror looked up the definition of "burglary,"
 one of the crimes with which the defendant was charged. 732
 P.2d at 1140. In both cases, we noted that "[j]urors are
 required to follow only the law as it is given in the
 court's instructions; they are bound, therefore, to
 accept the court's definitions of legal concepts and to
 obtain
 
 36
 
 clarifications of any ambiguities in terminology from the
 trial judge, not from extraneous sources."
 Niemand, 684 P.2d at 934; Wiser, 732 P.2d
 at 1141 (quoting Niemand, 684 P.2d at 934).
 
 
          ¶79
 Finally, in Harlan, this court found that the Bible
 scripture improperly considered by the jury during the death
 penalty phase of the case could be viewed as an improper
 "legal instruction, issuing from God, requiring a
 particular and mandatory punishment for murder." 109
 P.3d at 632.
 
 
          ¶80
 As Newman articulated, our prior decisions make
 clear that "legal content" means a statement of
 law. ¶ 23, 471 P.3d at 1252.
 
 
          b.
 Outside the Record
 
 
          ¶81
 "Extraneous" information is information gleaned
 from outside the record or information not included in the
 court's instructions to the jury. Determining whether
 information was introduced from outside the record is
 straightforward when the juror conducts an independent
 investigation into either the facts or the law. See
 id. at ¶ 32, 471 P.3d at 1253 (first citing
 People v. Wadle, 97 P.3d 932, 937 (Colo. 2004); and
 then citing Wiser, 732 P.2d at 1140). The question
 becomes much more difficult, however, when a juror instead
 relies on their prior knowledge and experience. See
 Kendrick, 252 P.3d at 1066 ("The line between a
 juror's application of her background . . . to the record
 evidence and a juror's introduction of legal content or
 specific factual information learned from outside the record
 can be a fine one.").
 
 37
 
 Still, jurors may properly "rely on their professional
 and educational expertise to inform their deliberations so
 long as they do not bring in legal content or specific
 factual information learned from outside the record."
 Id. at 1065.
 
 
          ¶82
 In Kendrick, we held that "the juror's use
 of her background in engineering and mathematics to calculate
 [the defendant]'s speed, distance, and reaction time and
 the sharing of those calculations with the other jurors did
 not constitute 'extraneous' information within the
 meaning of CRE 606(b)." Id. at 1066. We
 reasoned that, by performing and sharing those calculations,
 the juror "did not introduce any specific facts or law
 relevant to the case learned from outside of the judicial
 proceeding but, rather, merely applied her professional
 experience and preexisting knowledge of mathematics to the
 evidence admitted at trial." Id.
 
 
          ¶83
 In sum, to be permissible, the experience used by the juror
 in deliberations must be part of the juror's background,
 "gained before the juror was selected to participate in
 the case and not as the result of independent investigation
 into a matter relevant to the case" and, though the
 information may be relevant to the matter at hand, it must
 not include "extra facts or law, not introduced at
 trial, that are specific to parties or an issue in the
 case." Id.
 
 
          ¶84
 Because the line between past experience and extraneous
 information is a fine one, the admonition that we "err
 in favor of the lesser of two evils—protecting the
 secrecy of jury deliberations at the expense of possibly
 allowing irresponsible
 
 38
 
 juror activity"—is important. Garcia v.
 People, 997 P.2d 1, 7 (Colo. 2000) (quoting United
 States v. Thomas, 116 F.3d 606, 623 (2d Cir. 1997)).
 Permitting reliance on personal experience "furthers the
 purposes of CRE 606(b) by promoting the finality of verdicts
 and protecting jurors from harassment."
 Kendrick, 252 P.3d at 1065.
 
 
          4.
 The Unnamed Juror's Statement Did Not Constitute
 Extraneous Prejudicial Information
 
 
          ¶85
 Here, the unnamed juror's statement during deliberations
 that, during a prior jury service, the judge told the jury
 that it must deliberate until they come to a unanimous
 decision did not constitute extraneous prejudicial
 information.
 
 
          ¶86
 First, the juror's statement was not "legal
 content." The retelling of a prior jury experience, even
 the specific recollection of a judge's alleged statement
 about jury deliberations, is not a "statement of
 law." Second, the fact that the juror's statement is
 based on prior experience and was not the result of
 independent investigation further compels us to find that the
 statement was not extraneous. After all, "[a]s a
 practical matter, it is impossible to select a jury free of
 preconceived notions about the legal system or to prevent
 discussion of such information in the jury room."
 People v. Holt, 266 P.3d 442, 446 (Colo.App. 2011).
 
 
          ¶87
 Third, even if we concluded that the juror's statement
 was extraneous legal content, unlike in Niemand and
 Wiser, it was not relevant to the jury's
 decision. The statement did not concern any definition or
 element of the crimes with which
 
 39
 
 Clark had been charged. But even beyond that, the statement
 did not relate to any other matter the jury was charged with
 deciding. How long the jury was required to deliberate did
 not have anything to do with whether the prosecution had met
 its burden of proof.
 
 
          ¶88
 Therefore, the trial court correctly determined that the
 statement described in Juror LL's affidavit did not
 constitute "extraneous prejudicial information"
 under CRE 606(b).
 
 
          III.
 Conclusion
 
 
          ¶89
 We conclude that the erroneous denial of a for-cause
 challenge to a juror who evinces racial bias against the
 defendant is not structural error where the error was made in
 good faith and the biased juror did not actually participate
 in the jury. In addition, we conclude that a juror's
 statement during deliberations recalling a judge's
 alleged comment during her prior jury service was not
 extraneous prejudicial information under CRE 606(b).
 Accordingly, we affirm the judgment of the court of appeals.
 
 40
 
          
 JUSTICE HOOD, joined by JUSTICE GABRIEL, dissenting.
 
 
          ¶90
 This is a difficult and troubling case (at many levels) in
 which the division below and the majority here claim, in so
 many words, that obedience to doctrine forces us to swallow a
 bitter procedural pill. Despite declaring that racial bias is
 detestable in any context, Maj. op. ¶ 1, the majority,
 no doubt reluctantly, leaves unremedied the district
 court's failure to denounce racial bias during jury
 selection. Instead, it essentially says that we have little
 choice but to throw up our hands and concede, "no harm,
 no foul."
 
 
          ¶91
 But the district court's error in excusing overt,
 in-court racism[1] as nothing more than legitimate political
 opinion, produced at least two harms, both of which are
 difficult to quantify but unmistakably real. First, a
 criminal defendant like Reginald Keith Clark—to whom
 our state and federal constitutions pledge rights to equal
 protection and a fair trial—suffered the risk that some
 remaining venire members were emboldened to act on similar
 but unvoiced biases. Second, and no less important, the whole
 unseemly exercise leaves our system of criminal justice
 diminished in the eyes of the public.
 
 41
 
          ¶92
 Even so, the majority concludes that (1) People v.
 Novotny, 2014 CO 18, 320 P.3d 1194, contemplates only
 two kinds of structural error arising from an erroneous
 denial of a for-cause challenge (i.e., the explicitly biased
 juror sat or the court acted in bad faith), Maj. op.
 ¶¶ 40-41; and (2) equal protection principles are
 relevant to our structural error analysis in this context
 only when the record reflects intentional discrimination by
 the court, id. at ¶¶ 48-55. But because I
 believe fidelity to precedent doesn't leave us powerless
 to address the harm inflicted here, I respectfully dissent.
 
 
          I.
 Structural Error
 
 
          ¶93
 Our basic legal yardstick is straightforward. Structural
 errors "defy analysis by 'harmless-error'
 standards." Arizona v. Fulminante, 499 U.S.
 279, 309 (1991). There are "at least three broad
 rationales" for "[t]he precise reason why a
 particular error is not amenable to [harmless-error]
 analysis—and thus the precise reason why the Court has
 deemed it structural," Weaver v. Massachusetts,
 582 U.S. 286, 295 (2017):
 
 
 [1] errors concerning rights protecting some interest other
 than the defendant's interest in not being erroneously
 convicted; [2] errors the effects of which are too hard to
 measure, in the sense of being necessarily unquantifiable and
 indeterminate; and [3] errors that can be said to always
 result in fundamental unfairness,
 
 
 Howard-Walker v. People, 2019 CO 69, ¶ 25, 443
 P.3d 1007, 1011 (quoting James v. People, 2018 CO
 72, ¶ 15, 426 P.3d 336, 339).
 
 42
 
          ¶94
 Denying a party's for-cause challenge of a potential
 juror who expressed racial bias implicates the first two of
 these rationales. See Weaver, 582 U.S. at 296
 ("[M]ore than one of these rationales may be part of the
 explanation for why an error is deemed to be
 structural."). As noted, this error harms the defendant
 albeit in ways hard to measure. And the error implicates a
 public interest that extends beyond a defendant's
 interest in not being erroneously convicted.
 
 
          II.
 The Harm to Clark
 
 
          ¶95
 Let's start with the harm to Clark. Over thirty years
 ago, the Supreme Court warned that the presence of racial
 discrimination during voir dire is "often apparent to
 the entire jury panel, [and] casts doubt over the
 obligation of the parties, the jury, and indeed
 the court to adhere to the law." Powers v.
 Ohio, 499 U.S. 400, 412 (1991) (emphases added). By
 failing to release Juror K after he expressed racial bias,
 the court tacitly allowed the remaining venire members to
 cling to similar prejudices while deciding Clark's fate.
 
 
          ¶96
 As Judge Schutz explained in his separate opinion below: The
 district court's decision broadcasted to all who remained
 "that a prospective juror could sit in judgment of a
 person against whom he had an acknowledged racial bias."
 People v. Clark, 2022 COA 33, ¶ 98, 512 P.3d
 1074, 1091 (Schutz, J., concurring in part and dissenting in
 part). The district court placed an aura of legitimacy around
 Juror K's racial bias by failing to condemn it, and in
 turn, introduced the risk that
 
 43
 
 sitting jurors may have felt comfortable—or worse,
 empowered—to make judgments rooted in bias against the
 only "[B]lack gentleman" in the room—Clark.
 
 
          ¶97
 The majority dismisses this reality by claiming that
 "there is no evidence that the jury was aware of the
 challenge, let alone the court's ruling or its
 reasoning." Maj. op. ¶ 59. This argument suffers
 from a false premise: namely, that jurors lack the capacity
 to understand what is unfolding around them during our court
 proceedings. In my experience, however, jurors aren't as
 naive as my colleagues in the majority suggest.
 
 
          ¶98
 On the contrary, there are at least three reasons why the
 prospective jurors here undoubtedly understood the district
 court to affirm Juror K's ability to serve despite his
 racial bias. First, the court had already explained to
 prospective jurors the mechanics of the for-cause-dismissal
 stage of voir dire, so everyone knew that the court was
 determining whether prospective jurors were eligible to
 serve. Second, the prospective jurors had witnessed the court
 remove a juror whose impartiality it had found wanting. And
 third, the district court asked Juror K follow-up
 questions—something it had only done when a prospective
 juror's answers gave it some pause—before
 confirming that Juror K could serve. It's of no moment
 that the court's justification was given out of earshot
 of the prospective jurors. The ruling itself was clear: Even
 after expressing racial bias, Juror K was fit to serve.
 
 44
 
          ¶99
 The majority is equally wrong that "the only events the
 jurors witnessed were Juror K's comments during voir dire
 and Juror K's subsequent dismissal," which
 would've left them with the impression that "bias
 result[s] in dismissal." Id. Again, jurors are
 sharper than that. The court explained that the
 peremptory-challenge phase of voir dire was distinct from the
 for-cause stage. The court also emphasized that peremptory
 challenges don't require a reason and were attributable
 to the attorneys—not the court—so prospective
 jurors shouldn't "take any offense" at removal.
 The majority glosses over these facts, perhaps because they
 establish that no reasonable juror would have equated the
 defense's use of a peremptory strike with state
 condemnation of Juror K's racial bias.
 
 
          ¶100
 The district court's error thus goes to the very
 foundation of our criminal justice system—the
 impartiality of the criminal jury, the body responsible for
 determining a defendant's innocence or guilt. "When
 constitutional error calls into question the objectivity of
 those charged with bringing a defendant to judgment, a
 reviewing court can neither indulge a presumption of
 regularity nor evaluate the resulting harm." Vasquez
 v. Hillery, 474 U.S. 254, 263 (1986). Because these
 errors threaten the "right to an impartial adjudicator,
 be it judge or jury," they "'can never be
 treated as harmless.'" Gray v. Mississippi,
 481 U.S. 648, 668 (1987) (quoting Chapman v.
 California, 386 U.S. 18, 23 (1967)); accord People
 v. Abu-Nantambu-El, 2019 CO 106, ¶ 27, 454 P.3d
 1044, 1050.
 
 45
 
          ¶101
 Here, any bias Juror K introduced into the proceeding during
 voir dire lingered in the background of the entire trial.
 See Powers, 499 U.S. at 412 ("The influence of
 the voir dire process may persist through the whole
 course of the trial proceedings."). To what effect, we
 don't know exactly. But that doesn't mean we should
 ignore the possibility that the error tainted the remaining
 venire. This difficulty is precisely why the error is
 structural: "the effects of the error are simply too
 hard to measure." Weaver, 582 U.S. at 295.
 Indeed, it is "because a review of the record could not
 reveal the impact of the defect" that the error is
 structural. United States v. Iribe-Perez, 129 F.3d
 1167, 1172 (10th Cir. 1997); see also Vasquez, 474
 U.S. at 263-64 (concluding that discrimination in the grand
 jury selection was "not amenable to harmless-error
 review" because of "the difficulty of assessing
 [the] effect on any given defendant").
 
 
          ¶102
 The district court's error in refusing to excuse Juror K
 when Clark challenged him for cause jeopardized Clark's
 right to a fair trial by giving judicial approval to Juror
 K's racial bias in front of the remaining venire members:
 "[A] defendant has the right to an impartial jury that
 can view him without racial animus, which so long has
 distorted our system of criminal justice." Georgia
 v. McCollum, 505 U.S. 42, 58 (1992). Because that
 constitutional right is of paramount importance and because
 the effect of the district court's error evades an
 outcome determinative analysis, the district court's
 error was structural.
 
 46
 
          III.
 The Harm to the Integrity of the Justice System
 
 
          ¶103
 The error was also structural because it impugned the
 integrity of the justice system. Racial bias is "a
 familiar and recurring evil that, if left unaddressed, would
 risk systemic injury to the administration of justice."
 Pena-Rodriguez v. Colorado, 580 U.S. 206, 224
 (2017).
 
 
          ¶104
 I agree with Judge Schutz that what occurred during voir dire
 offends Clark's equal protection right to be free from
 state-approved racial discrimination. See Clark,
 ¶¶ 93-96, 102, 512 P.3d at 1090-91, 1092 (Schutz,
 J., concurring in part and dissenting in part). "By its
 inaction," the district court "made itself a party
 to" and "place[d] its power, property[,] and
 prestige behind" Juror K's racial bias. Burton
 v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961).
 Time and again the Supreme Court has acknowledged that
 similar inaction "undermine[s] public confidence in the
 fairness of our system of justice." Rivera v.
 Illinois, 556 U.S. 148, 161 (2009) (alteration in
 original) (quoting Batson v. Kentucky, 476 U.S. 79,
 87 (1986)); accord Pena-Rodriguez, 580 U.S. at 225;
 McCollum, 505 U.S. at 49-50; People v.
 Ojeda, 2022 CO 7, ¶ 20, 503 P.3d 856, 861-62. For
 that reason, "[n]o surer way could be devised to bring
 the processes of justice into disrepute" than "to
 permit it to be thought that persons entertaining a
 disqualifying prejudice were allowed to serve as
 jurors." Aldridge v. United States, 283 U.S.
 308, 315 (1931) (emphasis added). Yet that is the message the
 district court's error sends.
 
 47
 
          ¶105
 This is an affront to basic equal protection principles and
 does great harm to the public's perception of the justice
 system. See Mistretta v. United States, 488 U.S.
 361, 407 (1989) ("The legitimacy of the Judicial Branch
 ultimately depends on its reputation for impartiality and
 nonpartisanship."); McCollum, 505 U.S. at 49-50
 ("[T]he very foundation of our system of justice [is]
 our citizens' confidence in it.").
 
 
          ¶106
 The majority concludes that the district court's error
 wasn't structural because the error wasn't
 constitutional. Maj. op. ¶ 58. To the contrary, the
 underlying error in this case violated Clark's Sixth
 Amendment right to an impartial jury. "[I]f a trial
 court error results in the seating of a juror who is actually
 biased against the defendant, the defendant's right to an
 impartial jury is violated, the error is structural, and
 reversal is required."
 Abu-Nantambu-El, ¶ 30, 454 P.3d at 1050. There
 is no Sixth Amendment violation "so long as the jury
 that sits is impartial." United States v.
 Martinez-Salazar, 528 U.S. 304, 305 (2000) (quoting
 Ross v. Oklahoma, 487 U.S. 81, 88 (1988)). But I
 cannot say as much on these facts. Here, the district
 court's error invited similarly biased jurors to sit on
 Clark's jury. Thus, even without a formal equal
 protection violation, the court is still confronted with a
 constitutional error. And from there, the nub of the issue is
 simply whether the effects of that error "defy analysis
 by 'harmless-error' standards."
 Fulminante, 499 U.S. at 309.
 
 48
 
          
 ¶107 As discussed above, the error here fits that bill.
 The district court's error produced harms that (1) cannot
 be measured and thus defy an outcomedeterminative analysis
 and (2) concern interests other than the defendant's
 right to a sound verdict; namely, protection of the
 public's faith in the judiciary. Accordingly, the
 district court's error is structural and, in my opinion,
 entitles Clark to a new trial. See People v. Madrid,
 2023 CO 12, ¶ 60, 526 P.3d 185, 198. Thus, I
 respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] As of the 2020 Census, 5,077—or
 about 87.41%—of Gilpin County's 5,808 residents
 were "[w]hite alone." U.S. Census Bureau, Race
 and Ethnicity: Gilpin County, Colorado,
 https://data.census.gov/profile/Gilpin_County,_Colorado?g=050XX00US08047#race-and-ethnicity
 [https:// perma.cc/XA8B-MRQU].
 
 
 [2] We granted certiorari to review the
 following issues:
 
 
 1. [REFRAMED] Whether the trial court's erroneous
 denial of a defendant's for-cause challenge to a juror
 who expressed racial bias was harmless or structural
 error.
 
 
 2. Whether a juror's comments during
 deliberations, that she learned from a judge in prior jury
 service that jurors must deliberate indefinitely until a
 unanimous verdict is reached, constitute "extraneous
 prejudicial information" under CRE 606(b).
 
 
 [3] Because the courtroom where voir dire
 was held was not equipped to record bench conferences, the
 record of the conversation the parties had with the judge
 during the bench conference was made by the judge after the
 fact. After the parties had finished exercising their
 peremptory challenges, the bailiff took the jurors to the
 jury room and the judge summarized for the record the
 parties' for-cause challenges and the judge's rulings
 on them.
 
 
 [4] Because he would have reversed
 Clark's conviction based on his resolution of the
 challenge-for-cause issue, Judge Schutz declined to address
 the remaining issues. Id. at ¶ 106, 512 P.3d at
 1092 (Schutz, J., concurring in part and dissenting in
 part).
 
 
 [1] We agree with the division majority
 that there was a "glaring implication" that Juror K
 harbored an "acknowledged bias against nonwhite people
 like defendant." People v. Clark, 2022 COA 33,
 ¶ 16, 512 P.3d 1074, 1078. This inference now seems
 undisputed.
 
 
 ---------